**STATE of Maine**

v.

**Gordon R. ROBINSON, III.**

Supreme Judicial Court of Maine.

Argued April 29, 1985.

Decided Aug. 15, 1985.

---

**4.** *See supra* note 1 and accompanying text.

R. Christopher Almy, Dist. Atty., Michael Roberts, (orally), Gary F. Thorne, Asst. Dist. Attys., Bangor, for plaintiff.

Philip Worden, (orally), Perkins & Edwards, P.A., Richard Edwards, Guilford, for defendant.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

On June 21, 1984, a Penobscot County jury found defendant Gordon Robinson III guilty of Class A rape, 17–A M.R.S.A. § 252(1)(B) (1983). Finding no reversible error in his trial, we affirm the Superior Court's judgment of conviction.

I.

At trial the prosecutrix and defendant Robinson gave sharply divergent testimony as to what happened at her home in Garland on an October night in 1983. Defendant, who at that time lived in Dover-Foxcroft, said that he had driven to the prosecutrix's house in the early morning hours but had left when he saw through a window that she was talking on the telephone. Down the road he ran out of gasoline.

The prosecutrix testified that when she found Robinson at her door and heard that he had run out of gasoline and needed to use her telephone, she allowed him to come in to make his call. Rather than immediately using the telephone, however, defendant went into the living room with the prosecutrix and began watching the video cassette movie she was already playing.

The prosecutrix testified that defendant started a struggle with her and forced her against her will to have sexual intercourse with him. Defendant, by contrast, testified that the prosecutrix joined him in engaging in foreplay that culminated in consensual sexual intercourse. He recalled that during intercourse she suddenly declared, "I guess I don't want to do this anymore." He testified that he thereupon stopped, got dressed, and left.

■ During the jury's deliberations, it sent out the following question to the presiding justice:

> Concerning the law—if two people began consenting to an act, then one person says no and the other continues—is that rape?

In response, the justice instructed the jury in summary as follows:

> [I]f a couple consensually engages in sexual intercourse and one or the other changes his or her mind, and communicates the revocation or change of mind of the consent, and the other partner continues the sexual intercourse by compulsion of the party who changes his or her mind, then it would be rape. The critical element there is the *continuation under compulsion.*

(Emphasis added) The justice also repeated his careful description of what constitutes the compulsion necessary for a conviction for rape under the Criminal Code. At trial counsel for neither the State nor defendant Robinson objected in any way when the justice gave the supplemental charge. On appeal, however, defense counsel contends that, once the initial penetration of sexual intercourse is made with the woman's consent, her subsequent revocation of consent cannot transform continued sexual intercourse, even if compelled by the man, into rape. At most, it is suggested, the crime is simple or aggravated assault.

We reject defendant's appellate attack on the justice's supplemental instruction. We agree with the apparent unanimous view of all the participants at the time the instruction was given that the legislative intent expressed in the controlling provision of the Maine Criminal Code, as well as common sense, establishes the correctness of that instruction.

Section 252 of the Criminal Code defines adult rape to have three elements: (1) "sexual intercourse" by the defendant (2) with a person not the defendant's spouse (3) in circumstances by which that other person submits to the sexual intercourse as a result of compulsion applied by the defendant.[1] Only elements (1) and (3) are involved in the challenged instruction. In anybody's everyday lexicon, the continued penetration of the female sex organ by the male sex organ, after the time either party has withdrawn consent, is factually "sexual intercourse." At the same time, continued penetration is defined by section 251(1)(B) to be "sexual intercourse" in the sight of the law.[2] The presiding justice went on—

---

1. 17–A M.R.S.A. § 252(1)(B) (1983) provides:
   A person is guilty of rape if he engages in sexual intercourse:

   .        .        .        .        .

   B. With any person, not his spouse, and the person submits as a result of compulsion, as defined in section 251, subsection 1, paragraph E.
   17–A M.R.S.A. § 251(1)(E) (1983) reads in full:
   "Compulsion" means physical force, a threat of physical force or a combination

thereof which makes a person unable to physically repel the actor or which produces in that person a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon that person or upon another human being.

2. 17–A M.R.S.A. § 251(1)(B) (1983) provides in pertinent part:

we find entirely correctly—to charge the jury that the continuing sexual intercourse became rape if the prosecutrix submitted to the continuation only as a result of compulsion. We emphasize that the ongoing intercourse, initiated we here assume with the prosecutrix's consent, did not become rape merely because she revoked her consent. It became rape if and when the prosecutrix thereafter submitted to defendant's sexual assault only because "physical force, a threat of physical force or a combination thereof ... [made her] unable to physically repel the [defendant] or ... produce[d] in [her] a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon [her]." See n. 1 above. As in any rape case, the State must prove beyond a reasonable· doubt a whole lot more than mere absence of consent. The presiding justice was absolutely right in emphasizing:

> The critical element there is the continuation under compulsion.

In his answer to the jury's question, he was also complete in explaining the Code's definition of "compulsion" in the exact terms of the Criminal Code, see n. 1 above, thereby repeating with emphasis the explanation that he had given as part of the main charge.

Research by counsel, as well as by ourselves, has discovered only one case—*State v. Way*, 297 N.C. 293, 254 S.E.2d 760 (1979) —that comes close to providing a holding in support of defendant's position on appeal. In our view, the *Way* court did not cite any authority on point, and in any event erroneously stated the issue involved both there and here. The trial court in *Way* had charged the jury that "consent initially given could be withdrawn and if the intercourse continued *through use of force or*

*threat of force* ... this would constitute the crime of rape." *Id.* 254 S.E.2d at 761 (emphasis added). The North Carolina Supreme Court ignored the trial court's requirement of "force or threat of force" and stated:

> Under the court's instructions the jury could have found the defendant guilty of rape if they believed Beverly had consented to have intercourse with the defendant and in the middle of *that* act, she changed her mind. This is not the law.

*Id.* 254 S.E.2d at 761–62 (emphasis in original). We of course agree with the North Carolina court that a mere change of the woman's mind in the midst of sexual intercourse does not turn the man's subsequent participation into rape. But the *Way* opinion's misparaphrase of the jury instruction, so as to disregard entirely the critical element of compulsion, and its avoidance of any relevant analysis whatever turn into a mere *ipse dixit* its conclusion that "[i]f the actual [initial] penetration is accomplished with the woman's consent, the accused is not guilty of rape...." *Id.* 254 S.E.2d at 762. Review of the limited precedent from other jurisdictions, all of it of dubious pertinence to construing the Maine Criminal Code, establishes that we must resolve this case on the basis of our own best judgment of the.meaning of our statutory language, interpreted in light of the common sense of the situation here involved. We must decide what the Maine legislature intended when it defined rape as any sexual intercourse compelled of a nonconsenting partner by overriding physical force or threat of serious harm as defined in section 251(1)(E).

Practical, common sense considerations support our reading of Maine's rape stat-

---

"Sexual intercourse" means *any* penetration of the female sex organ by the male sex organ.

(Emphasis added) The case law almost always focuses upon the threshold invasion of the female's body and declares that sexual intercourse "is complete upon proof of penetration of the female organ by the male organ, however slight." *State v. Croteau*, 158 Me. 360, 362, 184

A.2d 683, 684 (1962) (quoting *King v. Commonwealth*, 165 Va. 843, 183 S.E. 187, 189 (1936)). The fact that the overwhelming bulk of rape cases involve the question whether the threshold entry of the female sex organ occurred cannot blink the fact that in either everyday or legal parlance *any* continuing presence of the male sex organ in the female organ constitutes sexual intercourse.

ute. Defendant's argument in essence is that rape occurs only when a male's entry of the female sex organ is made as a result of compulsion. By that argument, the question of rape or no rape in fact situations like the present one would turn on whether the prosecutrix, on revoking her consent and struggling against the defendant's forcible attempt to continue intercourse, succeeds at least momentarily in displacing the male sex organ. That makes for a close evidentiary call. Furthermore, it hardly makes sense to protect from a rape prosecution the party whose compulsion through physical force or threat of serious bodily harm is so overwhelming that there is no possible withdrawal, however brief. At the same time, there is no reason to strain to limit the ordinary meaning of the language of our rape statute for fear of a flood of possibly trumped up charges that courts have to adjudicate on the basis of diametrically opposed testimony of the man and the woman. The legislative intent that we find expressed in the rape statute does not impose any undue factfinding burden upon the courts. The determination of when ongoing sexual intercourse is transformed from a consensual joint exercise to unilateral action by one party forced upon an unwilling partner is little different from the determination that has to be made in applying the "voluntary social companion" defense provided under 17–A M.R.S.A. § 252(3) (1983). *See State v. Reed,* 459 A.2d 178, 180–81 (Me.1983). The dramatic change from the role of a voluntary participant to that of a victim compelled involuntarily to submit to the sexual intercourse is a distinct one.

For all that we know, the jury convicted defendant because it believed the prosecutrix's story to the effect that the entire sexual episode was the result of defendant's compulsion. However, if the jury credited defendant's story to the extent of his claim that the prosecutrix changed her mind in the middle of their consensual sexual intercourse, it could, under the court's instruction, have returned its guilty verdict *only* if it found *as a fact* that defendant compelled the woman to submit to his continued intercourse with her for a period after she had revoked her original consent. In that fact situation, the Criminal Code declares that the crime of rape has been committed. The presiding justice's supplemental instruction to the jury was a correct statement of the law.

## II.

We also find no merit in defendant's other contentions on appeal.

### A.

Immediately after the incident at the prosecutrix's Garland home, defendant, who was a former Dover-Foxcroft police officer, went to the Piscataquis County sheriff's office seeking protection from the personal attack he feared from the prosecutrix's boyfriend and his brother. There the deputy sheriff on duty, as well as the Dover-Foxcroft police sergeant called to the office, gave defendant the *Miranda* warnings. Then, as defendant testified at trial in characterization of his substantial silence, "I ... opted under my constitutional rights to say little to nothing." On cross-examination at trial, the State's attorney asked him why he did not tell his full story to the officers to whom he had gone for protection. Although trial counsel made no objection to that line of questions, counsel on appeal asserts that any use of defendant's prearrest silence to impeach him violated his fifth amendment rights not to testify against himself.

It is difficult to see any error at all in the challenged cross-examination. When defendant, a former police officer, went to the sheriff's office, he was not arrested or placed in custody, but stayed there as a matter of personal choice until his father came for him. Thus the giving of *Miranda* warnings was an unnecessary police exercise taken out of an excess of caution. *See Miranda v. Arizona,* 384 U.S. 436, 467–69, 86 S.Ct. 1602, 1624–25, 16 L.Ed.2d 694 (1966) (*Miranda* warnings re-

quired only before interrogating one in custody). *See also Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam). This case falls within the ambit of *Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980), holding that prearrest silence may properly be used to impeach a defendant who elects to testify. Defendant made a volitional, knowing decision "to say little to nothing" to his friends at the sheriff's office; and when he elected to take the stand at his trial and purport to tell his full story, he could properly be confronted with any reasonable inferences arising from his selective prearrest silence. Only thus will the integrity of the truth-seeking process be preserved. *Id.* The case at bar is *not* comparable to *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), involving silence *after* the defendant's arrest and *after* he had been given the *mandatory Miranda* warnings. In *Doyle*, the Supreme Court concluded that the *Miranda* warnings, mandated "as a prophylactic means of safeguarding Fifth Amendment rights," involve an implicit "assurance that silence will carry no penalty" and that "[i]n such circumstances, it would be fundamentally unfair ... to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 617–18, 96 S.Ct. at 2244–45. In the case at bar no *Miranda* warnings were required for prophylactic or any other purpose, and there is nothing unfair in the circumstances present here in cross-examining defendant about his failure to tell the officers the story he told on the stand.

█ In any event, even if we assume that the presiding justice committed error by not on his own initiative barring cross-examination about defendant's prearrest silence, defendant does not persuade us that "the error complained of is so highly prejudicial and so taints the proceeding as virtu-

ally to deprive the aggrieved party of a fair trial." *State v. Langley*, 242 A.2d 688, 690 (Me.1968). Since defendant raised this claim of error for the first time in his appellate brief, he can prevail only by satisfying the test of obvious error affecting substantial rights laid down by M.R. Crim.P. 52(b); that is, he can prevail only if "the obviousness of the error and the seriousness of the injustice done to the defendant thereby are so great the Law Court cannot in good conscience let the conviction stand." *State v. True*, 438 A.2d 460, 469 (Me.1981). Since this assumed error was never called to the attention of the presiding justice so that he could make a judgment from his vantage point whether in the trial context the cross-examination was error and, if so, whether adequate corrective measures could be taken at the time, we do not have to apply the relatively demanding test of harmless error. *Id.* at 467 (highly probable that the error did not affect the judgment). Here, the unobjected-to cross-examination, even if under the microscope of appellate review we were to conclude it constituted error, was not so obviously wrong as well as so highly prejudicial[3] as to require us to vacate the results of defendant's trial. *See id.* at 467–69.

### B.

█ Contrary to defendant's contention both at trial and now on appeal, the presiding justice did not err in refusing to instruct the jury on the "voluntary social companion" defense, which under 17–A M.R.S.A. § 252(3) could reduce the rape to a Class B crime. The testimony before the jury contained no evidence that generated that defense. *Cf. State v. Giglio*, 441 A.2d 303, 311 (Me.1982) (where put in issue by the evidence, "voluntary social companion" defense is "not only proper, but necessary"). For that defense to be generated, the record must contain evidence that, if believed, would show that the prosecutrix while a voluntary social companion to de-

---

**3.** "[T]rial counsel's failure to object to the inadmissible evidence, whether as a result of tactical decision or oversight, will itself be a considera- tion in determining whether the error is obvious and highly prejudicial." *State v. True*, 438 A.2d 460, 468 (Me.1981).

fendant permitted him "sexual contact," which is by 17–A M.R.S.A. § 251(1)(D) (1983) defined as "any touching of the genitals ... *other than as would constitute a sexual act* ...." (Emphasis added) Since by section 251(1)(C) the "sexual act" excluded from "sexual contact" encompasses sexual intercourse and oral contact with sex organs,[4] and since in this case there was no testimony of any other touching of the genitals of either party, *cf. State v. Reed*, 459 A.2d 178 (Me.1983) (evidence that prosecutrix manipulated the defendant's penis), the record is devoid of any basis for the jury to find that the prosecutrix here permitted defendant "sexual contact." Even if the prosecutrix permitted the sexual intercourse initially, that consensual sexual intercourse by definition is not the "sexual contact" that, if permitted in preliminaries to intercourse, will lower the classification of the subsequent rape.[5]

The entry is:

Judgment affirmed.

All concurring.

4. 17–A M.R.S.A. § 251(1)(C) (1983) reads in full: "Sexual act" means any act of sexual gratification between 2 persons involving direct physical contact between the sex organs of one and the mouth or anus of the other or direct physical contact between the sex organs of one and the sex organs of another, or direct physical contact between the sex organs of one and an instrument or device manipulated by the other. A sexual act may be proved without allegation or proof of penetration.

5. We recognize the anomaly of denying the "voluntary social companion" defense where the prosecutrix permits the defendant to have sexual intercourse with her, but granting that defense if she had permitted mere hand-touching of the genitals. Any such anomaly, however, is apparent on the face of the statute, and we would be legislating, rather than adjudicating, if we were to ignore the plain language of our Criminal Code.