## STATE OF CONNECTICUT *v.* GALEN PLOURDE
### (12918)

PETERS, C. J., HEALEY, SHEA, GLASS and HULL, Js.

Argued June 2—decision released August 2, 1988

*G. Douglas Nash,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Judith Rossi,* deputy assistant state's attorney, with whom, on the brief, were *Timothy Liston,* assistant state's attorney, and *Jack W. Fischer,* legal intern, for the appellee (state).

PETERS, C. J. The dispositive issue in this appeal is whether the admission into evidence of the defendant's

silence following his receipt of *Miranda* warnings violated his right to due process of law. A jury found the defendant, Galen Plourde, guilty of murder in violation of General Statutes § 53a-54a (a).[1] He appeals from the judgment sentencing him to forty years imprisonment. We find error and remand for a new trial.

On the morning of December 16, 1983, the body of the victim, Ada Plourde, was found in her automobile, which was parked in the parking lot of My Brother's Place Cafe in Cromwell. The state's theory of the case was as follows: On the evening of Thursday, December 15, the victim left her husband, the defendant, and their two young daughters at home in Berlin to attend a data processing class at Avon High School. Following her usual practice, she drove to the house of a friend, Bernice Prusacyk, in Farmington. The two of them then drove together to the class. Since the final exam was scheduled for that evening, class let out earlier than usual. After doing some Christmas shopping, Prusacyk and the victim went to Chuck's Restaurant in Farmington for drinks and chips. The two returned to Prusacyk's home by 11 p.m. and the victim departed. When she returned home, the victim and the defendant became involved in an argument. During an ensuing physical struggle, the defendant strangled the victim to death. The defendant placed the victim's body and the bags containing her purchases in her car. He then removed the victim's jewelry and tore up the shopping bags to create the appearance of a robbery. He drove the car to the parking lot of My Brother's Place Cafe, which was located about a mile from his house. After walking home, he made several phone calls to the police reporting his wife's absence

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception."

in order to establish an alibi. To suggest a possible motive, the state presented evidence that the defendant and the victim had had marital difficulties and that the defendant had become involved with another woman.

On appeal, the defendant claims that the trial court erred in: (1) denying his motion for acquittal based on the insufficiency of the evidence; (2) admitting his post-*Miranda* silence on December 17 and on December 18 into evidence and instructing the jury to use that silence to infer guilt; (3) admitting his post-*Miranda* statements and conduct; and (4) suppressing evidence of the defendant's willingness to take a polygraph test.[2] We agree with the defendant that the court erred in admitting his post-*Miranda* silence of December 18 and accordingly remand for a new trial.

I

Because success on his insufficiency of the evidence claim would entirely shield the defendant from further criminal proceedings; *State* v. *Pellegrino,* 194 Conn. 279, 294, 480 A.2d 537 (1984); we turn to this issue first. At the close of the state's evidence and again at the close of all the evidence, the defendant filed motions for acquittal, both of which the trial court denied. On appeal, the defendant renews his claim that there was insufficient evidence to establish his identity as the killer. In particular, he argues that the evidence failed to show that the victim returned home on the evening in question. He also assails the other evidence produced

[2] The defendant argues in addition that the trial court erred in: (1) giving the jury an instruction on the inference to be drawn from the victim's statement to Prusacyk that she was going home when no such statement was in evidence; (2) denying the defendant's motion for mistrial after the jury became deadlocked; and (3) charging the jury in its supplemental instruction with regard to the intent necessary to find murder. As these remaining claims may not arise in the course of a new trial, we decline to consider them at this juncture.

to establish his guilt. We are not persuaded that the evidence was insufficient to support his conviction.

Review of the defendant's claim of insufficiency requires us to undertake a two part inquiry: " 'We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' " *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987), quoting *State* v. *Sinclair,* 197 Conn. 574, 576, 500 A.2d 539 (1985).

The state produced the following evidence to establish that the victim had returned home after leaving Prusacyk's house: Prusacyk testified that it was the victim's habit to go directly home after she left Prusacyk's home on Thursday nights. On the evening in question, the two became tired and decided to go home early because they were not enjoying themselves.[3] In addition, Heather Plourde, who at the time of her mother's death was seven years old, testified that, subsequent to the murder, she had told the police that late that Thursday night, she had come downstairs, found her mother asleep on the couch and kissed her good-night. She added, however, that she had gotten her "days mixed up." On cross-examination, she testified that she had arisen that night to go to the bathroom but had not gone downstairs and that her statement to the police had been mistaken. Under the circumstances, the

---

[3] Given this testimony, the fact that Prusacyk failed to testify that the victim said she was going home is of little import.

jury could have believed that the later version of the events represented Heather Plourde's attempt to exculpate her father. Accordingly, the jury could reasonably have credited the first version given to the police.[4] On the basis of Prusacyk's and Heather Plourde's testimony the jury could reasonably have found that the victim had returned home the night of her death.

The state lent further support to its case against the defendant by its introduction of evidence of multiple cuts on his face and torso, which it claimed were a result of his physical struggle with the victim. Ronald Cornell, a Cromwell police officer, testified that during a phone conversation on December 16, the defendant had volunteered that while taking out the trash the prior evening he had received a cut on his lip from some wood protruding from a barrel. The following day, when Cornell picked up the defendant to drive him to the morgue for identification of the victim, he noticed the cut on the defendant's lip. Charles MacIntyre, a state police detective, testified that, during the subsequent interview, he had also observed the cut on the defendant's lip as well as scratches on the defendant's neck. At this time, the defendant, contradicting his previous statement to Cornell, explained that the scratch on his lip had occurred on Wednesday, December 14, while he was moving around some trash barrels. During the interview, the defendant stated that he had received the scratches on his torso the same day when an aluminum ladder had fallen on him in the garage. To discredit the defendant's explanations of the scratches, the state introduced evidence that coworkers who had

---

[4] The defendant attempts to discredit Heather Plourde's testimony on the basis of records not in evidence. Our review here is limited, however, to whether the jury's verdict had a reasonable basis in the evidence before it. Statements that the defendant failed to introduce at trial have no bearing on our inquiry. The defendant also argues that Heather Plourde's prior statement to the police was not admissible at trial as substantive evidence. Having failed to raise this issue below, he is precluded from raising it here.

been with the defendant on Thursday, December 15, had not noticed any cuts on his face and that no traces of blood had been found on the ladder. Although the defendant presented both lay and expert testimony to the contrary,[5] the jury was free to disregard this testimony and could reasonably have found that the scratches resulted from a fight between the defendant and the victim.

The state's proof also emphasized the defendant's behavior and statements during the police interviews. According to MacIntyre's testimony, at one point in their conversation, the defendant indicated that his wife had scratched him while they had been making love. When asked to display the scratch, he pulled aside his sweater and shirt and began to scratch himself until told to stop. Later during the same interview, MacIntyre informed the defendant that he believed the defendant had killed his wife. The defendant did not deny the accusation and after further discussions indicated that he wanted to speak to a lawyer. The defendant's claim to the contrary notwithstanding, we conclude that the jury could reasonably have viewed this evidence as supporting the defendant's guilt.

The state introduced the results of forensic tests that were consistent with the defendant's guilt. Examination of a green fiber found on the victim's lip revealed microscopic characteristics very similar to a doily from the top of a table in the victim's house. Serological exams of the victim's blood indicated that the victim had type B blood and was a secretor, meaning that B and H antigens could be detected in her body fluids. The defendant had type A blood and was a nonsecretor. Blood discovered on the defendant's watch band

---

[5] The defendant's daughter Gail testified that she had seen the sticks protruding from the barrel and had told her father that they were a safety hazard. An expert witness testified that it was highly unlikely that the scratches, due to their pattern, had been produced by fingernails.

contained A, B and H antigens. Blood smears found under the armrest in the victim's car and on a sales slip found in the back seat likewise contained all three antigens. Even though other explanations of these results might have been plausible, the jury could reasonably have credited the state's interpretation, that the smears represented a mixture of the victim's and the defendant's blood.[6]

Finally, the state presented evidence to suggest a possible motive. Several witnesses testified to earlier marriage difficulties between the defendant and the victim. In addition, Regina Rentz testified that the defendant had called her several times at work the week of December 12, 1983. According to her testimony, the defendant and she began to see each other four months after the victim's death.

From our review of this record, we conclude that, while not overwhelming, the evidence, when taken together, was sufficient to allow the jury reasonably to find the defendant guilty beyond a reasonable doubt.[7] The jury could have believed, on the basis of the testimony of Prusacyk and Heather Plourde, that the victim returned home the night of December 14. It could also have found that the scratches on the defendant, his subsequent conduct and the results of the forensic examinations further corroborated the state's theory. The defendant's insufficiency claim must accordingly fail.

---

[6] In addition, evidence of traces of type B blood on the victim's house key but not on the other keys attached to her keyring suggested that type B blood had rubbed off on the key and had dried before the key came in contact with the other keys.

[7] The autopsy revealed the presence of partially digested potato skins in the victim's stomach, which were unaccounted for in the state's version of the events and which, according to the defendant, proved that the victim had not returned home the evening in question. In addition, an expert comparison of soil found on the victim's slacks and a soil sample from the victim's yard revealed that the soil on the slacks had not come from that portion of soil in the yard. Given the other evidence, however, the jury was free not to assign particular weight to this evidence.

## II

The defendant's principal claim is that the trial court's admission into evidence of his silence and request for a lawyer following his receipt of *Miranda* warnings violated his due process rights as guaranteed by the fourteenth amendment to the United States constitution. *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). This claim concerns two separate conversations between the defendant and the police, one with MacIntyre at the morgue on December 17, and another the next day with David Bates, a state police detective, at the barracks in Hartford. We decline to review the admissibility of the first of these conversations, but we conclude that the second should have been suppressed.

Initially, we note that the defendant failed to raise this claim at trial either by way of objection or motion to suppress. While we do not generally entertain claims not raised below, we have recognized an exception "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Accordingly, we must consider the record to determine whether it is adequate for the purpose of our review.

The defendant's first complaint of a *Doyle* violation concerns the introduction into evidence of his silence in response to police accusations on the occasion of his conversation with MacIntyre at the morgue on December 17. Cornell testified that, on the previous day, the defendant had made a statement that Cornell transcribed on sheets of paper at the top of which *Miranda* warnings were printed. The defendant read the statement over several times and signed the bottom of each page. MacIntyre testified that, during the interview the

next day, when he accused the defendant of having killed his wife, the defendant "did not deny" it. After "further discussions," the defendant terminated the interview by requesting to talk to a lawyer. The defendant argues on appeal that the trial court's admission of this portion of MacIntyre's testimony violated due process because it breached the assurance implicit in the printed *Miranda* warnings he had received on December 16 that his silence would not be used against him.

We deem this record insufficient to review the defendant's claim. Our conclusion is primarily based on the absence of evidence that the defendant actually read and therefore received the *Miranda* warnings. The defendant urges us to infer that he read the preprinted warnings from Cornell's testimony that the defendant had reviewed his statement several times. There is no testimony, however, to indicate that the defendant read the warnings themselves. In addition, there is no evidence that, during the interview the following day, the defendant was invoking his right to silence in response to MacIntyre's charge. MacIntyre's statement that the defendant "did not deny" the accusation can reasonably be interpreted to mean that the defendant did, in fact, respond, but that his response did not constitute a denial of the charge. We therefore decline to review the defendant's claim that admission of this testimony violated due process. See *State* v. *Leecan,* 198 Conn. 517, 524, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986).[8]

---

[8] The defendant alternatively invokes the second *Evans* exception, under which we will review newly raised claims involving "a new constitutional right not readily forseeable [that] has arisen between the time of trial and appeal." *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Our conclusion that the record is deficient for the purposes of review under the first *Evans* exception, however, precludes our review under this exception as well.

The defendant's second *Doyle* challenge concerns the trial court's admission of his statements and conduct during an interview with the police on December 18. According to Bates' testimony, on that morning he went to the defendant's house in order to execute a search and seizure warrant upon his person. After explaining the purpose of the warrant, Bates informed the defendant that he was not under arrest but that he was required to comply with the execution of the warrant and that when it was completed he would be free to go. Bates read the *Miranda* rights to the defendant from a preprinted form and then asked the defendant to read the form aloud initialing each right to indicate his comprehension. The defendant complied with the request. Where the caption "WAIVER" appeared in the middle of the form he crossed out the word and inserted the phrase "understanding of rights." He then placed his initials next to each sentence on the form except for the last sentence, which stated: "I am willing to answer questions and make a statement knowing that I have these rights, I do not want a lawyer. I know and understand what I am doing. I do this freely and voluntarily and no threats or promises have been made to me." Lastly, he signed the bottom of the form.

Thereafter, Bates drove with the defendant to police barracks in Hartford for the execution of the warrant. After the search procedures had been completed, Bates informed the defendant that he was free to leave and offered him a ride home. When Bates then asked if the defendant would be willing to stay and talk with the police, the defendant responded that "he would sit and listen and [the police] could talk." For the next twenty or so minutes, the police detailed the evidence linking the defendant to the crime. Bates testified that, as the defendant listened, he "became visibly shaken. His eyes began to redden. I could see tears welling up in his eyes

and I could see him actually shaking." Eventually, the defendant indicated that "he would give a statement, but that he wanted to call his lawyer to see if he could get the best deal." He was then allowed to call his lawyer who arrived to pick him up an hour later.

We conclude that this record is adequate for the purposes of reviewing the defendant's *Doyle* claim. Bates' testimony that the defendant read, corrected and initialed the Waiver of Rights form demonstrates that the defendant received and understood the *Miranda* warnings. Notwithstanding the state's contention to the contrary,[9] the defendant's statement that he would "sit and listen" and his subsequent silence during the police recitation clearly demonstrated his intent to invoke his right to remain silent. See *State* v. *Pellegrino,* supra, 290–93. His assertion of his intention to make a statement in the future, after consultation with his attorney, was a further indication of his intent during the interview to remain silent and was inextricably intertwined with it. We therefore turn to the merits.

In *Doyle* v. *Ohio,* supra, the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding in two considerations: First, it noted that silence in the wake of *Miranda* warnings is "insolubly ambiguous" and consequently of little probative value. Second and more important, it observed that "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who

[9] The state attempts to characterize the defendant's decision to remain at the barracks to hear the evidence the police had against him as "a waiver" of his right to be silent. The defendant may have chosen, however, to remain at the barracks in the reasonable belief, based on the *Miranda* warnings he had received earlier, that he could invoke his right to be silent without incurring any penalties.

receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle* v. *Ohio,* supra, 617–19. The court recently reaffirmed *Doyle's* reasoning in *Wainwright* v. *Greenfield,* 474 U.S. 284, 290, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), in which it held that the defendant's silence following his arrest and receipt of *Miranda* warnings could not be used at trial to rebut his defense of insanity. The court reasoned: "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity." Id., 292. Consistent with this rationale, the court has concluded that use at trial of silence *prior* to the receipt of *Miranda* warnings does not violate due process. *Fletcher* v. *Weir,* 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982) (postarrest silence); *Jenkins* v. *Anderson,* 447 U.S. 231, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (prearrest silence); see *Wainwright* v. *Greenfield,* supra, 291 n.6.

Acknowledging that, unlike the defendants in *Doyle* and *Greenfield,* he was not under arrest when he invoked his right to remain silent, the defendant nonetheless advances two theories for the extension of *Doyle* to the facts of this case: Initially, he contends that, even though he was not formally under arrest at the Hartford barracks, he was in police custody. Alternatively, he argues that *Doyle* applies whenever *Miranda* warnings have been given regardless of an arrest or custody. We agree with the latter argument.

The record belies the defendant's claim that he was in custody after the search and seizure was completed.

Although the defendant was in custody when Bates drove him to the Hartford barracks for execution of the warrant, Bates testified that, when the search had been completed, he had made it clear to the defendant that he was free to go. The record discloses that, after the interview at the morgue the previous day, the police had promptly driven the defendant home. The defendant therefore had no reason to doubt the sincerity of Bates' offer of a ride from the Hartford barracks the following day.

We are nevertheless persuaded that the defendant's invocation of the right to be silent was not admissible. "*Doyle* and subsequent cases have . . . made clear that breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." *Wainwright* v. *Greenfield,* supra, 291; see *Greer* v. *Miller,* 483 U.S. 756, 763, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987). The unfairness of using a defendant's silence following *Miranda* warnings is not mitigated by the absence of custody. "*Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances." *Wainwright* v. *Greenfield,* supra, 291; *Fletcher* v. *Weir,* supra, 606; *Anderson* v. *Charles,* 447 U.S. 404, 407–408, 100 S. Ct. 2180, 65 L. Ed. 2d 222, reh. denied, 448 U.S. 912, 101 S. Ct. 27, 65 L. Ed. 2d 1173 (1980). Custody is therefore not a prerequisite to a *Doyle* violation.[10]

---

[10] We have previously declined to resolve the question of whether *Doyle* applies to the use of a defendant's pre-arrest silence following receipt of *Miranda* warnings in *State* v. *Shashaty,* 205 Conn. 39, 529 A.2d 1308, cert. denied,      U.S.     , 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988). The two other state courts that have considered this issue have arrived at opposite conclusions. In *State* v. *Robinson,* 496 A.2d 1067, 1072 (Me. 1985), the Supreme Judicial Court of Maine concluded that because the administra-

In this case, the police administered *Miranda* warnings to the defendant prior to taking him into custody to execute the search and seizure warrant. Nothing in the words or conduct of the police after the search had been completed indicated that the assurances implicit in the *Miranda* warnings were no longer in force. Under the circumstances, the defendant could have invoked his right to remain silent in the reasonable belief that the state would not thereafter use that silence against him. The record does not indicate that the defendant spoke during the police recitation except to invoke his rights to remain silent and to a lawyer. Thus, this is not a case in which the defendant was selectively silent. Cf. *Anderson* v. *Charles,* supra, 408; *State* v. *Casey,* 201 Conn. 174, 185–86, 513 A.2d 1183 (1986); *State* v. *Talton,* 197 Conn. 280, 295, 497 A.2d 35 (1985). In this context, use of the defendant's silence as affirmative proof at trial was "fundamentally unfair and a deprivation of due process." *Doyle* v. *Ohio,* supra, 618.[11]

Having concluded that admission of this portion of Bates' testimony was error, we next consider whether such error was harmful. When an error is of constitutional dimension, the state has the burden of proving it harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24–26, 87 S. Ct. 824, 17 L.

---

tion of *Miranda* warnings had been unnecessary under the circumstances, the warnings' prophylactic function would not be served were the defendant's silence held inadmissible at trial. In contrast, the Wisconsin Supreme Court reasoned that "[r]eceipt of the *Miranda* warning is the important factor in the *Doyle* analysis, not whether the defendant has been arrested. Therefore, the *Doyle* rationale protects post-*Miranda* silence whether occurring before or after arrest." *State* v. *Fencl,* 109 Wis. 2d 224, 234, 325 N.W. 2d 703 (1982). The Seventh Circuit Court of Appeals recently affirmed the Wisconsin court's reading of *Doyle. Fencl* v. *Abrahamson,* 841 F.2d 760, 764–65 (7th Cir. 1988).

[11] The unfairness of the admission of the defendant's silence into evidence was compounded by the trial court's instruction to the jury. See footnote 12, infra.

Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967); *State* v. *Green,* 207 Conn. 1, 9, 540 A.2d 659 (1988). The state did not address this issue either in its brief or its argument to this court. From our review of the record, we conclude that the error was not harmless beyond a reasonable doubt. Since the state's case was based exclusively on circumstantial evidence, there was a "reasonable possibility" that the improperly admitted evidence of the defendant's silence in the face of police accusations contributed to his conviction. *State* v. *Hoeplinger,* 206 Conn. 278, 294, 537 A.2d 1010 (1988). A new trial is therefore in order.

Our conclusion that the defendant's silence at the Hartford barracks was inadmissible under *Doyle* is dispositive of the defendant's related claim that the trial court erred in instructing the jury that it could use that silence to infer the defendant's guilt.[12] Further, our holding renders it unnecessary to consider the defendant's alternate contention that admission of his statements and conduct at the barracks violated his rights

---

[12] The relevant portion of the court's charge provided: "Now, also there is another area that when the Defendant was at the Medical Examiner's Office, again it is for you to recall whether or not this, in effect, occurred. But the testimony of Trooper MacIntyre was that at some time during the stay at the Medical Examiner's Office, he told the Defendant that he thought he killed his wife. I gather, I guess that was made later at Police Headquarters in Hartford; again, it's for you to recall whether or not, in fact, there was any response by the Defendant. It is the state's position that there was not. That when these officers said that to the Defendant, he did not respond in any particular way audibly by saying something in response to those statements. Now, the statement made within an accused['s] hearing which are relevant and material to which he makes no reply may be given in evidence as indicative of conduct on his part when the circumstances show that he heard, understood, and comprehended the statement; and the facts are know[n] to him and he had an opportunity to speak and the circumstances naturally call for a reply from him." As we declined to review the defendant's *Doyle* claim regarding the interview with MacIntyre at the morgue, we do not address the propriety of this instruction to the extent that it refers to that interview.

under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

## III

Because it is likely to arise at a new trial, we lastly address the defendant's claim that the court erred in excluding evidence of the defendant's willingness to take a lie detector test. We find no error in this ruling by the trial court.

The relevant testimony was the subject of a motion in limine by the state: MacIntyre testified out of the presence of the jury that, during the interview at the morgue, after he had accused the defendant of killing his wife, he had asked the defendant whether he would be willing to take a lie detector test. The defendant responded that he would do so after checking with his lawyer. In support of excluding this portion of testimony, the state argued that it had no probative value. In opposition, defense counsel argued that he intended to use the testimony to impeach MacIntyre's earlier statement that the defendant had become uncooperative at that point in the interview at issue. Over objection by the defendant, the court ruled that the evidence was inadmissible.

On appeal, the defendant renews his argument that this evidence was admissible. Although he did not do so at trial, he now couches his claim in constitutional terms: In essence, he argues that exclusion of this testimony impaired his right of confrontation as guaranteed by the sixth amendment, as it did not permit him to impeach MacIntyre's testimony that the defendant was disinclined to cooperate. We do not agree.

We have repeatedly observed that a "defendant's right to cross-examination 'is not absolute and is subject to reasonable limitation by the [trial] court.' " *State* v. *Milner*, 206 Conn. 512, 525, 539 A.2d 80 (1988); *State*

v. *Jones,* 205 Conn. 638, 670, 534 A.2d 1199 (1987); *State* v. *Thompson,* 191 Conn. 146, 148, 463 A.2d 611 (1983).The principal function of confrontation is " 'to secure for the opponent the opportunity of cross-examination.' " (Emphasis omitted.) *Davis* v. *Alaska,* 415 U.S. 308, 315–16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), quoting 5 J. Wigmore, Evidence (3d Ed. 1974) § 1395, p. 150. The constitutional standard is satisfied if defense counsel, through cross-examination is "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska,* supra, 318; *State* v. *Milner,* supra, 525; *State* v. *Weidenhof,* 205 Conn. 262, 271, 533 A.2d 545 (1987).

In this case, we agree with the state that, because of its minimal probative value, the defendant's willingness to take a polygraph test does not significantly implicate the reliability of MacIntyre's testimony. Due to their questionable accuracy, the results of a polygraph examination are not admissible either as positive proof or for the purposes of impeachment. *State* v. *Miller,* 202 Conn. 463, 485–86, 522 A.2d 249 (1987). In *State* v. *Carnegie,* 158 Conn. 264, 272, 259 A.2d 628, cert. denied, 396 U.S. 992, 90 S. Ct. 488, 24 L. Ed. 2d 455 (1969), we held that evidence of the defendant's willingness to take a polygraph test, which the defendant proffered to rehabilitate her credibility, was properly excluded because of the "almost complete lack of probative value [of such consent] and because of its self-serving character." That the defendant in this case sought to use the evidence for a different purpose than the defendant in *Carnegie* does not significantly augment the probative value of the testimony; nor is its admissibility mandated because the defendant here clothes his argument in constitutional terms. The trial court did not restrict defense counsel's cross-

examination of MacIntyre in any other respect. We conclude that the defendant's right of confrontation was not violated.[13]

There is error, the judgment is set aside and the case is remanded for a new trial in accordance with this opinion.

In this opinion the other justices concurred.

---

[13] The defendant claims that even if exclusion of this portion of MacIntyre's testimony did not constitute constitutional error, it was an abuse of discretion. As he advances no separate argument in support of this claim, we decline to consider it further.