2000 ME 187

**STATE of Maine**

v.

**Teddy MAIZEROI.**

Supreme Judicial Court of Maine.

Argued Sept. 5, 2000.
Decided Oct. 30, 2000.

Stephanie Anderson, District Attorney, Julia Sheridan, Asst. Dist. Atty. (orally), Portland, for State.

Robert A. Levine (orally), Portland, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Teddy Maizeroi appeals from a judgment entered in the Superior Court (Cumberland County, *Atwood, J.*) following a jury verdict of guilty on one count of gross sexual assault. 17–A M.R.S.A. § 253(1)(A) (Class A).[1] The jury returned a verdict of not guilty for Maizeroi on a second charge of unlawful sexual contact. 17–A M.R.S.A. § 255(1)(H) (Class C).[2]

---

1. The relevant sections read:
§ 253.  **Gross sexual assault**
1.  A person is guilty of gross sexual assault if that person engages in a sexual act with another person and:
A.  The other person submits as a result of compulsion, as defined in section 251, subsection 1, paragraph E;
17–A M.R.S.A. § 253(1)(A) (1983 and Supp. 1999).
§ 251(1)(E).  **"Compulsion"**
"Compulsion" means the use of physical force, a threat to use physical force or a combination thereof that makes a person unable to physically repel the actor or produces in that person a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon that person or another human being.
"Compulsion" as defined in this paragraph places no duty upon the victim to resist the actor.
17–A M.R.S.A. § 251(1)(E) (1983 and Supp. 1999).

2. The relevant section reads:
§ 255  **Unlawful sexual contact**
1.  A person is guilty of unlawful sexual contact if the person intentionally subjects another person to any sexual contact, and:

Maizeroi contends (a) that the trial court improperly instructed the jury regarding what constitutes compulsion; (b) that the trial court erred in instructing the jury that the victim had no duty to resist Maizeroi; (c) that there was insufficient evidence to prove the compulsion element of the offense of gross sexual assault; (d) that the guilty verdict on Count 1, gross sexual assault, is inconsistent with the not guilty verdict on Count 2, unlawful sexual contact, and therefore mandates reversal; (e) that the trial court erred in excluding "inconsistent" grand jury testimony proffered to establish motivation to fabricate a lack of consent; (f) that the trial court erred in admitting evidence that the victim had attended counseling following the rape allegation; and (g) that the trial court erred in instructing the court reporter to excise certain portions of the cross-examination of the victim, when reading back testimony to the jury. We conclude that the court did not err, and, therefore, we affirm the judgment of conviction.

## I. BACKGROUND

[¶ 2] On April 18, 1999, 20–year–old Teddy Maizeroi and some of his friends, including 19–year–old Lawrence Westbrook, went to a party in Windham, at the home of a 16–year–old friend of the victim. The friend's parents were away on vacation at the time of the party. The hostess and Westbrook had met the night before the party, at the Metropolis, a chemical-free Portland night club for teens.

[¶ 3] Westbrook, Maizeroi, and his friends rode to the party together in a white Suburban. To avoid attracting attention to the fact they were having a party, the group parked the Suburban at a home three (3) houses down the street from the victim's friend's home. Also present at the party was the 16–year–old victim. Although they were minors at the time of the party, the party-goers were all consuming alcohol. Early in the evening

Westbrook and the hostess engaged in consensual sexual relations.

[¶ 4] The victim admitted that, throughout the evening, she had been drinking "sysco, and boonie's and vodka," and that she had kissed Westbrook and Maizeroi. She testified that she discovered, at some point during the evening, that Westbrook and her friend had engaged in consensual sexual intercourse. Later in the evening Westbrook asked the victim if she would like to go outside. At first she declined but, subsequently, agreed to go outside with Westbrook. She assumed they were "going out to smoke or something." Maizeroi followed them outside. When they were outside of the house, the three walked toward the Suburban, with Westbrook holding one of the victim's arms and Maizeroi holding the other. As a result of her alcohol consumption, the victim acknowledged that she "couldn't really walk that good."

[¶ 5] Once at the Suburban, the victim entered from the passenger side and sat on the center seat with Westbrook, while Maizeroi initially stood outside the vehicle. The victim and Westbrook then began kissing. When Westbrook attempted to lay on top of her, however, she testified that she told him to get off. She testified that Westbrook then unbuckled her pants and Maizeroi, who was still standing outside the car, reached into the vehicle and pulled off her pants. She further testified that while Westbrook was engaged in intercourse with her, Maizeroi went to the driver's side center seat of the Suburban and tried to put his penis in her mouth. By keeping her hand over her mouth, she was able to keep Maizeroi's penis from penetrating her mouth, but it touched her face. She stated that she was saying "no" and "trying to move off" in order to get Westbrook off of her person. The victim testified that Westbrook persisted, even after she said, "no." While Westbrook

H. The other person submits as a result of compulsion.

17–A M.R.S.A. § 255(1)(H) (1983 and Supp. 1999).

was engaged in sexual intercourse with the victim, he allegedly asked her if she liked what he was doing. She testified at trial that she did not remember Westbrook asking her this question, however, she remembered telling Detective Boudreau that Westbrook had asked her if she enjoyed the sexual intercourse.

[¶ 6] As the victim was recovering from the sexual intercourse with Westbrook, Maizeroi came into the van, pushed her down, and began to have sexual intercourse with her. She testified that she also told Maizeroi "no" and to "get off" but that she did not scream or yell aloud. She further testified that Westbrook told Maizeroi that "maybe you should get off." While Maizeroi was having sexual intercourse with her, she was "saying no, moving around and stuff," but was unable to move him off her. Eventually Maizeroi stopped having intercourse with her. She subsequently got dressed, left the vehicle, and returned to the house. Several witnesses testified that, when the victim arrived back at the house, she appeared upset and began to cry, and eventually recounted that Westbrook and Maizeroi raped her.

[¶ 7] The next day the victim told her friends the details of the rape. Although she remembered telling them that she had sexual intercourse with Westbrook twice, she could not recall, at trial, the number of times she and Westbrook had intercourse. Specifically, during her grand jury testimony, the victim acknowledged that she may have told "someone" that Westbrook had sexual intercourse with her more than once, but at that time she could not remember if Westbrook had sex more than once with her. Upon further questioning, the following exchange occurred:

State: "I guess I should be clear. By more than once I mean, did they have intercourse with you, then stop, then

they would have intercourse again, did that happen with either of the two of them?"

Answer: "I don't think so. I might have thought it happened with Lawrence, but then I didn't really know for sure, so I don't want to say something that I don't definitely know."

State: "Why would you not know whether Lawrence had intercourse with you once or more than once?"

Answer: "I don't know. My mind wasn't in a good state of thinking right then, so . . . ."

[¶ 8] Doctor Gina Marie Quinn–Skillings testified that she examined the victim at the Maine Medical Center Emergency Room the day after the party. Dr. Quinn–Skillings testified that, in an attempt to determine if the victim had suffered any physical injuries, she asked her whether there was any resistance on her behalf. The victim told her that she did not resist.

[¶ 9] The jury found Maizeroi guilty of gross sexual assault. 17–A M.R.S.A. § 253(1)(A) (Class A).[3]

## II. DISCUSSION

### A.

[¶ 10] Jury instructions are reviewed "as a whole to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law." *State v. Day*, 1999 ME 29, ¶ 8, 724 A.2d 1245, 1247 (citations omitted). An erroneous instruction is one that "creates the possibility of jury confusion and a verdict based on impermissible criteria." *Id.* (quoting *State v. Rivers*, 634 A.2d 1261, 1263 (Me.1993)).

[¶ 11] Maizeroi asserts that the Superior Court erred in not giving jury instructions premised upon *State v. Robinson*, 496 A.2d 1067 (Me.1985).[4] The State

---

**3.** Maizeroi was sentenced to five (5) years with all but 16 months suspended, and two years of probation. Lawrence Westbrook

plead guilty to committing a sexual assault against the victim.

**4.** In *Robinson* the court instructed the jury that "[i]f a couple consensually engages in

asserts that the court properly instructed the jury as there was no evidence that the victim consented to consensual sexual intercourse with Maizeroi. The trial court instructed the jury as follows:

"Under Maine law a person is guilty of gross sexual assault if that person engages in a sexual act with another person and that other person submits as a result of compulsion."

*     *     *     *     *     *

"A sexual act may be proved without allegation or proof of penetration. Compulsion means the use of physical force, threat to use physical force or combination thereof that makes a person unable to physically repel the actor. This legal definition of compulsion places *no duty* on the victim to resist the act."

[¶ 12] There was no evidence or testimony that the victim agreed to engage in consensual sexual intercourse with Maizeroi. *Robinson* authorizes, but does not require, the requested instruction when there is evidence that the intercourse initially started as a consensual act between the parties. The trial court's instructions correctly and fairly informed the jury in all necessary respects of the governing law. *See State v. Day*, ¶ 8, 724 A.2d at 1247. Given that there was no evidence that the sexual act in question began as a consensual act between the parties, the court did not err in refusing to give jury instructions based on *State v.. Robinson.*

### B.

[¶ 13] Maizeroi also argues that the court erred when it instructed the jury that, pursuant to 17–A M.R.S.A. § 251(1)(E), the victim had no duty to resist. Maizeroi asserts that instructing that the victim had no duty to resist the physical force was inappropriate under these circumstances because the State was not proceeding on a theory of compulsion grounded on a threat, or fear of kidnapping, serious bodily injury, or death.

[¶ 14] In construing a statute, we must attempt "to discern from the plain language the real purpose of the legislation, avoiding results that are absurd, inconsistent, unreasonable or illogical ...." *Fraser v. Barton*, 628 A.2d 146, 148 (Me. 1993) (citation omitted). When the plain language of the statute is ambiguous, we will look to other indicia of legislative intent, such as legislative history, to determine the purpose of the legislation. *Dumond v. Aroostook Van Lines*, 670 A.2d 939, 943 (Me.1996) (citations omitted).

[¶ 15] The plain language of 17–A M.R.S.A. § 251(1)(E) is internally inconsistent. The statute requires that the victim be incapable of physically repelling the actor, yet at the same time, explicitly states that the victim has no duty to resist. The legislative Statement of Fact indicates that the purpose of "this amendment, which replaces the original bill, clarifies the present statutory definition of compulsion by adding a clear statement that the victim of compelled sexual assault is not required to 'fight back' or otherwise resist in any way." Comm. Amendments "A" to S.P. 217, L.D. 544.

[¶ 16] There was sufficient evidence for a jury to find that the victim was compelled to engage in sexual intercourse with Maizeroi. Here, there was certainly some degree of drunkenness, and the victim testified that she could not repel Maizeroi; the jury must have believed her. Given the facts of this case, and the legislative history of 17–A M.R.S.A. § 251(1)(E), because the victim of the sexual assault repeatedly said "no" and "stop," and Maizeroi continued to engage in sexual intercourse, his behavior consti-

---

sexual intercourse and one or the other changes his or her mind, and communicates the revocation or change of mind of the consent, and the other partner continues the sexual intercourse by compulsion of the party who changes his or her mind, then it would be rape. The critical element there is the continuation under compulsion." *Robinson* at 1069.

tuted "compulsion" within the meaning and intent of the legislation. The Superior Court did not err in declining to exclude the jury instruction that the victim had no duty to resist Maizeroi.

### C.

[¶ 17] Maizeroi further argues that there was insufficient evidence for the jury to convict him of gross sexual assault. When considering the sufficiency of the evidence, we evaluate the evidence presented in the light most favorable to the prosecution to determine whether the jury rationally could find, beyond a reasonable doubt, every element of the offense charged. *State v. Ardolino*, 1997 ME 141, ¶ 20, 697 A.2d 73, 80. "[I]t is the duty of the factfinder to reconcile conflicting testimony, determine its relative weight and decide what part of the testimony is credible and worthy of belief." *Ardolino*, ¶ 20, 697 A.2d at 80 (citing *State v. Benner*, 654 A.2d 435, 437 (Me.1995)).

[¶ 18] A reasonable jury could have found that the victim submitted to sexual intercourse with Maizeroi as a result of compulsion. Here the victim continued to resist throughout the assault. There is no evidence that she initially consented to intercourse with Maizeroi. Moreover, although she did not specifically testify that she tried to "push" Maizeroi off, she testified that she was "still saying no, moving around and stuff" when Maizeroi was having sexual intercourse with her. Finally, she testified that Westbrook told Maizeroi that "maybe you should stop."

### D.

[¶ 19] Maizeroi argues that the guilty verdict on the gross sexual assault, 17–A M.R.S.A. § 253(1)(A) (Class A) and the not-guilty verdict on the charge of unlawful sexual contact, 17–A M.R.S.A. § 255(1)(H) (Class C), are incapable of reconciliation, mandating reversal. It is not without question that the verdicts were inconsistent, but if they were, in *State v. Engstrom*, 453 A.2d 1170, 1174 (Me.1982), we held that "inconsistent verdicts require reversal only if they are incapable of logical reconciliation." We have subsequently clarified *Engstrom*, explaining that "[l]ogically reconcilable verdicts are not inconsistent and therefore do not require reversal." *State v. Snow*, 513 A.2d 274, 277 (Me.1986). More specifically, in *Snow* we noted that "[t]his court has never decided that inconsistent verdicts do require reversal." *Id.* at 277.

[¶ 20] In *State v. Finnemore*, 1997 ME 44, ¶ 6, 690 A.2d 979, 980, we were confronted with the issue of inconsistent jury verdicts on separate counts of a single indictment. We looked to *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), which set forth four factors courts should consider in instances such as this. First, the court noted that "inconsistent verdicts should not be interpreted as a windfall to the prosecution because the jury may have properly reached its guilty verdict, and 'then through mistake, compromise, or lenity, arrived at an inconsistent conclusion ....'" *State v. Finnemore*, 1997 ME 44, ¶ 8, 690 A.2d 979, 980 (citing *United States v. Powell*, 469 U.S. 57, 65, 105 S.Ct. at 476, 83 L.Ed.2d 461). Second, "any attempt to separate a verdict that may be the product of an error that worked against one of the parties would be based on pure speculation or would involve inappropriate inquiry into the jury's deliberations." *Id.* Third, "a criminal defendant is already protected against jury irrationality or error by independent review of the sufficiency of the evidence by the trial and appellate courts." *Id.* Finally, that the mere inconsistency between guilty and not-guilty verdicts on separate counts of a single indictment will not render the guilty verdict invalid. *Id.* at ¶ 9, 690 A.2d at 981.

[¶ 21] For the foregoing reasons, we should not speculate about why the jury found Maizeroi not guilty on the charge of

unlawful sexual contact, nor will we vacate the judgment on that basis.

E.

[¶ 22] Maizeroi asserts that the victim's trial testimony [5] was inconsistent with her grand jury testimony,[6] and therefore, her grand jury testimony should have been admitted as a prior inconsistent statement. Whether a prior statement is inconsistent is a preliminary question for the court, and is reviewed for clear error. *See* Field & Murray, *Maine Evidence*, § 607.4 at 267, § 104.1 at 30 (2000 ed.). Factual findings are clearly erroneous only when there is no competent evidence in the record to support them. *State v. Seamen's Club*, 1997 ME 70, ¶ 7, 691 A.2d 1248, 1251.

5. During trial the following exchange occurred between the victim and the State:
  Q: When Lawrence was on top of you having intercourse with you did he say anything to you?
  A: I don't remember.
  Q: You remember telling the police in a statement that you gave Detective Boudreau that Lawrence had asked you if you liked it and that you answered him?
  A: Yeah, I did.
  Q: When Lawrence asked you, do you remember him asking you that?
  A: Slightly.
  Q: Okay. You remember telling the police about that?
  A: Yes.
  Q: Do you remember when Lawrence asked you if you liked it if you answered him back?
  A: No, not really.
  Q: Do you remember telling the police, Detective Boudreau specifically, that you did not answer back when he asked you if you like it?
  A: No.
  Q: Did you ever tell Detective Boudreau that you answered yes to that question if you liked it?
  A: No.
  Q: Do you remember telling Detective Boudreau why you answered yes to Lawrence's question if you liked it?
  A: I don't remember.
  Upon reexamination by the State, and after having her recollection refreshed, the victim testified as follows:

[¶ 23] The victim's trial testimony, after her memory was refreshed, was virtually identical to her grand jury testimony. She testified, both at trial and before the grand jury, that Westbrook asked her if she "liked it." She also testified at trial and before the grand jury that she answered his question with a "yes." Because the victim's trial testimony was not inconsistent with her grand jury testimony, the Superior Court's preliminary finding of fact that the testimony was not inconsistent was not clearly erroneous.[7]

F.

[¶ 24] At trial evidence was presented that the victim received counseling following the rape. Maizeroi argues that this information was wrongly admitted be-

  Q: Does that refresh your recollection about Lawrence Westbrook asking you if you liked it while you were in the car seat with him?
  A: Yes.
  Q: What did Lawrence say about asking you if you liked it? What did he say?
  A: Yes.
  Q: And how did you respond?
  A: I said yes so that he would maybe stop and get off.

6. Maizeroi points to the following grand jury testimony as inconsistent with the victims trial testimony:
  Q: Did Lawrence say anything to you while he was having intercourse with you?
  A: He just said, does it feel good or something.
  Q: Okay. When Lawrence said, does it feel good, did you answer him at first?
  A: Not at first.
  Q: Did he—did you eventually answer him?
  A: Yes.
  Q: Why did you eventually answer him?
  A: For him to stop saying it.

7. Because we find the trial testimony to be consistent with the grand jury testimony, the court did not abuse its discretion in excluding the grand jury testimony. *See State v. Robbins*, 666 A.2d 85, 86 (Me.1995) (we review the trial court's evidentiary ruling to exclude evidence for an abuse of discretion).

cause it was not relevant, and that "even if it was relevant, its impact upon the jury was unduly prejudicial, in that it tended to elicit sympathy for the victim and thereby, to bolster her credibility." We review the Superior Court's determination of relevancy for clear error. *State v. Napier*, 1998 ME 8, ¶ 5, 704 A.2d 869, 871 (citations omitted).

[¶ 25] The court explained that it allowed in evidence the testimony regarding the victim's counseling because the victim's demeanor at trial was "not what one commonly sees[,]" and, therefore, the court allowed in the evidence as an explanation for the victim's unusual courtroom behavior. Moreover, the victim's testimony regarding the intimate details of the rape by Maizeroi was far more likely to elicit sympathy than her comments that she began counseling. The court did not err by allowing the testimony.

### G.

[¶ 26] Maizeroi argues that the Superior Court erred in instructing the court reporter to read only certain portions of the cross-examination of the victim. The determination of whether to read-back the direct and cross-examination testimony of a witness is within the trial justice's discretion, based on all the facts of the case. *State v. Hebert*, 455 A.2d 925, 930 (Me.1983) (citation omitted). It is not necessarily an abuse of discretion to allow a read-back of only a portion of a witness's testimony. *See id.* at 931 n. 4; *see also State v. MacDonald*, 382 A.2d 553, 554 (1978) (no abuse of discretion in rereading only the direct testimony of a witness).

[¶ 27] Maizeroi argues that the Superior Court erred in editing the read-back to exclude references to inconsistent statements by the victim to others about whether she engaged in consensual sex

with Westbrook after Maizeroi left the Suburban. Maizeroi further asserts that the jury wanted to hear what the victim had to say about whether she did, or did not engage in consensual sexual intercourse with Westbrook after Maizeroi left the vehicle. The jury requested the following:

> The members of the jury would like to have the following items of testimony read back to them:
>
> 1) [The victim's] testimony about the events inside the suburban from the time the defendant engaged in sexual intercourse until the underwear was returned to [the victim].
>
> 2) Detective Boudreau's testimony when *cross-examined* by Mr. Levine in regard to the aforementioned sequence of events [the events inside the suburban from the time Maizeroi engaged in sexual intercourse until the underwear is returned], specifically the written statement taken by the headmaster of Bridgton Academy.

[¶ 28] The jury's second request shows that the jury was capable of being very specific regarding what testimony it wanted reread. If the jury wanted all portions of the victim's testimony, including all of the victim's cross-examination, it would have requested that testimony. The court did not abuse its discretion in reading back to the jury only the materials it specifically requested.

The entry is:

Judgment affirmed.