*518 OPINION OF THE COURT
Patrick D. Monserrate, J.
Following a July 29, 1988 Huntley hearing held in the referenced matter, the court is asked to decide the trial admissibility of certain statements and admissions concededly made by the defendant on December 23, 1985.
The current test — approved at both State and Federal levels —which is to be applied by suppression courts in making such determinations concerning the use by the government of evidence obtained from the words of a citizen-suspect is one of the "totality of circumstances”. That is, whether, under the totality of circumstances of the particular interrogation, the court finds that the product thereof was not involuntary — in fact or in law (CPL 60.45) — so as to require its suppression.
Such a standard suggests a synthesizing of the several aspects of an interrogation — the who, what, where, why and how — so as to provide an overview, and then, rather than to isolate or emphasize any factor to the exclusion of any other(s), to measure the composite against the rule which requires fundamental fairness to be observed by government agents in dealing with citizens: due process of law.
The circumstances of the interrogation under review are both uncontroverted and uncomplicated. By late December of 1985 Broome County officials had come to believe that the defendant — formerly employed in the business office of a county nursing home who had since transferred to the Department of Social Services (DSS) — may have misappropriated funds during her tenure at the home.
To confirm those suspicions it was decided that David R. Martin, then Deputy Director of Security for the county,[1] would attempt to question the defendant about the matter. To that end he went to her place of county employment on the afternoon of December 23rd. He was accompanied by Paul Spencer (Supervisor of the Willow Point Nursing Home) and Linda Williams, a member of the Security Division staff.[2]
By préarrangement with DSS officials the defendant had been requested/directed by her supervisor to attend "an inter *519 view”, though she was not told with whom she was to meet or about what.
After introductions all around Martin and the defendant’s former supervisor began to "lay out the case” of the investigation to date, including some ledger sheets apparently showing discrepancies between receipts and deposits.
Then occurred this colloquy between Martin and the defendant:
"Dave: I have to rule out errors. It’s too consistent [sic]. I appeal to you this would be the best time to explain.
"Sandra: You are saying that something is wrong?
"Dave: You can’t fight what is in front of you. This is no mind game. The lines and columns cannot be disputed. Why is it this way?
"Sandra: (just sat for several minutes looking at the ledgers)
"Dave: You can look at these all day, they are not going to change. As I told you, we have to bring in the State Auditor and Federal Investigators. We may also have to do financial backgrounds and that type of thing. Now would be the time to tell me before I get into this investigation with all of these other people.
"Sandra: I think I need to talk to someone.
"Dave: We are the people to talk to.
"Sandra: Other than you people.”
During his hearing testimony Martin candidly admitted that subjectively he understood the defendant’s remarks about talking with "someone” to mean someone to give her advice— as a lawyer.[3] However, he persisted in his questioning, and almost immediately evoked from the defendant no fewer than four separate statements indicating her desire not to discuss the matter further:
"Dave: If this is something other that [sic] a mistake, I would appreciate it if you could fill us in on how long and to *520 what extent this has gone on and if other people are involved or just you?
"Sandra: I don’t think I should say anything right now.
"Dave: What about other people?
"Sandra: I don’t think I should say anything right now.
"Dave: Once the Auditors come in, it could take three or four months to get to the bottom of this.
"Sandra: I understand what you are saying.
"Dave: I need to know the extent of this. Should I leave the room and you could talk to Paul? Would you feel more comfortable?
"Sandra: No.
"Dave: How about the Social Security check? Were there large numbers of checks or was it just one? Was it mostly cash?
"Sandra: I need to talk to someone and I am just not going to say anything here right now. I’m just not.
"Dave: Why, because you are involved [sic] or not?
"Sandra: I am not going to say anything.
"Dave: Is your husband also employed with the county?
"Sandra: Yes.
"Dave: I know Duane. You have a home on 206?
"Sandra: Yes.”
Thereafter the defendant made incriminating admissions in response to Martin’s accusatory questions. The admissions were incorporated into a typed statement which she read and signed. The defendant was permitted to go her own way at the conclusion of the two-hour interview (which coincided with the end of her workday). At no time had she been advised of her constitutional rights against self-incrimination and to the assistance of counsel.
An attempt by Martin to reinterview the defendant on January 2, 1986 was aborted by her statement that she had retained an attorney.
Counsel for the defendant contends that once the defendant’s wishes to discontinue discussing the matter were communicated to Martin he was under a duty to honor her wishes (People v Wander, 47 NY2d 724 [1979]) rather than to forge ahead, virtually ignoring her protestations, and even arguably increasing the intensity of his questioning by some veiled reference to her husband’s potential vulnerability as a county *521 employee.[4] Counsel for the People counters that Martin was under no such constraint since the session with the defendant was not "custodial” in the Miranda sense (Miranda v Arizona, 384 US 436 [1966]), and that the judicial injunction to "scrupulously honor” a suspect’s asserted right to silence applies only when made before/during custodial interrogation.[5] His argument proceeds that by subsequently responding to Martin’s further inquiries she displayed such a change of mind or heart as would render irrelevant her earlier expressions of reluctance or refusal to discuss the matter.
While, as pointed out herein, several circumstances will be factored into the court’s ultimate determination of admissibility or suppression, the arguments of counsel (and perhaps a perception of the state of the law) suggest that it might be useful to discuss in some detail the legal implications of a citizen’s attempted invocation of the putative right against self-incrimination to which, we are constantly told, we all have a right under the Constitutions of this country and this State. Particularly, to what extent it matters whether such assertion takes place in a "custodial” setting.
The focus of inquiry as to whether or not a particular police-suspect interview session is "custodial” is comparatively *522 new to the criminal law. Its primary importance flows from the 1966 declaration by the Supreme Court in Miranda (supra) designating that phase in a criminal investigation when law enforcement personnel would come under an affirmative duty to advise suspects of their constitutional rights against self-incrimination and to the assistance of counsel (Miranda v Arizona, supra).
That was the thrust of Miranda (supra): to create new duties for the police, not to create new rights for suspects (and clearly not to diminish old ones). The rights of a citizen in this country to remain silent in the face of official accusation and to speak with a lawyer rather than to the police have existed, not for two decades, but for two centuries.
More plainly and pertinently put: The circumstance whereby the questioning of the defendant may not have been "custodial” means only that she didn’t have to be told of her right "to stop answering questions at any time” — not that she didn’t have such a right.
In the court’s view it would be unreasonable to conclude that in a situation — whether in 1985 or 1885 — where a citizen has the presence of mind to assert such a revered American right as that of remaining silent, a representative of the government is under no obligation to pay heed thereto, but may continue his pursuit of incriminating information and, if successful (whether by persistence, persuasion, or guile), the product is usable in court, just as if the declarant had been ignorant of his rights or elected not to assert them. For thé court to permit the defendant’s assertions to be disregarded would be to disregard, in turn, the traditional concept in this country — and in this State — of the constitutional rights on an individual vis-á-vis his government, whose agents are sworn to uphold the one and to serve the other.
Early Supreme Court interpretations of the Federal Constitution may have been open to the argument that the Fifth Amendment protection for a citizen against being "compelled in any criminal case to be a witness against himself’ was meant for and limited to the courtroom. However, no later than 1897 that concept was laid to rest, never to be resur-. rected (see, Bram v United States, 168 US 532).
The course of the court during this cpntury has been direct and deliberate as it has moved inexorably toward defining in expansive terms the constitutional rights of individuals being subjected to police interrogation. Whether grounded in a *523 Fourth Amendment right against unlawful detention (Wong Sun v United States, 371 US 471 [1963]), a right against self-incrimination (Bram v United States supra; Wan v United States, 266 US 1 [1924]; Chambers v Florida, 309 US 227 [1940]; White v Texas, 310 US 530 [1940]; Ward v Texas, 316 US 547 [1942]; Culombe v Connecticut, 367 US 568 [1961]; Lynumn v Illinois, 372 US 528 [1963]), and/or a due process right of "refusal of disclosure” under the Fifth Amendment (Brown v Mississippi, 297 US 278 [1936]; Watts v Indiana, 338 US 49 [1949]; Malloy v Hogan, 378 US 1 [1964]), or the Sixth Amendment right to counsel (Crooker v California, 357 US 433 [1958]; Cicenia v Lagay, 357 US 504 [1958]; Spano v New York, 360 US 315 [1959]; Massiah v United States, 377 US 201 [1964]), the court recognized and enforced these rights long before Miranda’s "custodial interrogation” threshold was conceived of or constructed much less crossed.
The Miranda decision is in part a retrospective on the historical evolution of the right against self-incrimination and of the importance of the protection afforded to citizens of this Nation, and others before it, against being required to incriminate themselves. Chief Justice Warren placed Miranda (and its immediate predecessor, Escobedo v Illinois, 378 US 478 [1964]) in plain perspective when he noted: "[0]ur holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings. * * * [B]ut an explication of basic rights that are enshrined in our Constitution * * *. These precious rights were fixed in our Constitution only after centuries of persecution and struggle. And in the words of Chief Justice Marshall, they were secured 'for ages to come, and * * * designed to approach immortality as nearly as human institutions can approach it’ ”. (Miranda v Arizona, supra, at 442.)
New York’s Court of Appeals has been arguably even more vigilant in safeguarding the rights of its citizens who are subjected to police questioning. In interpreting rights flowing from the State Constitution — some of them so fundamental and important as even to be unwaivable by the citizen[6] — that court has probably taken this State as far as any in preserving, protecting, and defending for its citizens the historic constitutional promises of security from unwarranted governmental intrusion in any of its forms.
*524 That court has enforced the right of the citizen who says "You may not enter” from having used against him evidence obtained from the warrantless governmental intrusion into his home (People v Loria, 10 NY2d 368 [1961]), it has enforced the right of every person who says "I won’t go” from having his person seized and held for questioning against his will without warrant or probable cause (People v Johnson, 64 NY2d 617 [1984]; People v Morales, 42 NY2d 129 [1977]), it has enforced the right of any person under police questioning — whether custodial (People v Cunningham, 49 NY2d 203) or not (People v Skinner, 52 NY2d 24) — to say "I want a lawyer” and by those words to preclude the fact or benefit of further interrogation;[7] and it has clearly and specifically enforced the right of a citizen undergoing custodial interrogation to say — even once —"I don’t want to talk with you about this” by saying such assertion must be "scrupulously honored”, and to the extent it is not the sanction of suppression will ensue. (People v Wander, 47 NY2d 724, supra.)
Would that same court refuse to enforce the right of silence of a citizen who invokes it four times in succession to her government accuser, merely because the setting was not so clearly "custodial” that she, hypothetically, was free to leave? I think not.[8]
Of what value to the citizen is such a historic and monumental right not to speak in the face of government inquiry or accusation if its invocation can be ignored at the time by agents of that government and its spirit will not later be enforced by its courts? None.
Sandra Knapp did what she could to suspend the inquiry against her by attempting to say that which she had every right to say: Nothing. It is the constitutional duty of this court *525 to give meaning that assertion of her right by denying to the People the product of their agent’s continuing interrogation in the face of such legitimate claim of constitutional privilege.
CONCLUSION
Reviewing the totality of circumstances of the December 23, 1985 interrogation of the defendant by governmental agents of Broome County, the court finds the session to have been:
tinged with the custodial overtones of a "quasi-police” interview in which she was directed/required to participate by her governmental employer and was not given any of the warnings perhaps required in such a setting;
tainted by an admittedly equivocal assertion by her of her desire to first speak with someone who could "advise” her— especially when taken in combination with the questioner’s candid admission that he understood her to probably mean a lawyer;
tinctured with the subtle, yet potentially coercive suggestion that what was transpiring might affect not only her own continued county employment, but that of her husband as well;
and, finally, flawed (whether fatally so in isolation or only in combination is the only uncertainty) by the failure of the government agent to honor in any way whatsoever the defendant’s repeated assertions of her right not to discuss the matter, though she ultimately did so.
For the reasons given, the statements and admissions, both oral and written, attributed to the defendant as having been made during the subject interview should be suppressed from use in evidence by the People at trial.

. And therefore, both "peace officer” (CPL 2.10) and a "public servant” (Penal Law § 10.00 [15]; CPL 60.45 [2] [b] [ii]).

. Through whose presence and efforts a rough transcript of the interrogation was constructed and conceded by the parties to be substantially accurate. During the course of the two-hour session she also typed the inculpatory statement which the defendant signed.

. Was such an exchange the type of assertion of the defendant’s constitutional right to the assistance of counsel as would — particularly in New York — require the cessation of the questioning and/or the suppression of anything thereafter produced through the interview? (People v Cunningham, 49 NY2d 203 [1980].) And regardless of whether the questioning was "custodial” or not (People v Skinner, 52 NY2d 24 [1980]). Perhaps (People v Esposito, 68 NY2d 961 [1986]; People v Buxton, 44 NY2d 33 [1978]) and perhaps not (People v Fridman, 71 NY2d 845 [1988]; People v Hicks, 69 NY2d 969 [1987]; People v Johnson, 55 NY2d 931 [1982]). But certainly a circumstance to be considered.

. A chilling echo of the rhetorical "You have relatives in the old country?” interrogation tactic used by the "bad guys” to pry information from the "good guys” in the "B movies” of the 1940’s. Can what followed from the defendant, after such a thinly veiled reference to her husband’s county employment — and its possible connection (if only in her mind) to her cooperation with Martin — reasonably be called "voluntary”? A circumstance, and whatever else its import it clearly removes the present case from the purview of the narrow exception afforded in cases where a suspect first claims a right of silence, but later relinquishes it. (Michigan v Mosley, 423 US 96 [1975]; People v De Pasquale, 54 NY2d 693 [1981]; People v Kinnard, 62 NY2d 910 [1984].) What is required in such cases is a clear showing (not present here) that the resumption of the interview was the suspect’s idea, with no "help” from the police.

. But do not her repeated protestations against being where she was, being questioned by whom she was, about that which she was, suggest that the government-employer dominated session by then had evolved into a situation from which she wished to extricate herself, but knew not how? Might a reasonable person (even an innocent one) consider herself not "free to leave” (People v Yukl, 25 NY2d 585 [1969]) and thus be entitled to be formally advised of her several rights? Among them that she could terminate the interview: she could "stop answering questions at any time”. Perhaps (Minnesota v Murphy, 465 US 420 [1984]; People ex rel. Maiello v New York State Bd. of Parole, 65 NY2d 145 [1985]; People v Parker, 57 NY2d 815 [1982]) and perhaps not (People v Palumbo, 49 NY2d 928 [1980]). Another circumstance not to be ignored.

. See, People v Hobson, 39 NY2d 479 (1976); People v Rogers, 48 NY2d 167 (1979), and their progeny.

. Then Chief Judge Cooke’s succinct statement in People v Skinner (52 NY2d 24, 29) seems particularly appropos: "Once an individual expresses the need for counsel he or she stands in the same position as one who has obtained the aid of an attorney”.

. By interesting coincidence, the Supreme Court of Connecticut has recently reversed a murder conviction where the Trial Judge had permitted the prosecution to use in evidence the fact that a criminal suspect declined to discuss the matter when being questioned in a noncustodial setting and after receiving gratuitous Miranda warnings (State v Plourde, 208 Conn 455, 545 A2d 1071 [Aug. 2, 1988]). The court noted that, under such circumstances, to use even the defendant’s silence against him (much less his words) was error so violative of fundamental fairness that it was fatal to his conviction though the issue had not even been raised in the trial court either by objection or motion to suppress.