******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.*
# JAYVELL WASHINGTON
## (SC 20495)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crimes of intentional manslaughter in the first degree with
a firearm, criminal possession of a pistol or revolver, and carrying a
pistol or revolver without a permit in connection with the shooting
death of the victim, the defendant appealed. The defendant had parked
his car in front of a gas station. The victim parked his car near the gas
station and then walked along the adjacent sidewalk directly toward
the defendant's car. When the victim reached the defendant's car, he
attempted to see through the car's tinted windows. The driver's side
door then opened, and both the defendant and the victim exchanged
gunfire. One of the defendant's several shots at the victim proved to be
fatal. At trial, defense counsel claimed that the defendant had killed the
victim in self-defense. During the trial, the trial court heard arguments
from both parties, outside of the jury's presence, regarding the admissi-
bility of two recorded phone calls that the defendant had made to his
sister, L, from a holding cell on the morning after he was arrested. The
recordings captured conversations between the defendant, L, and two
male acquaintances, and certain portions arguably constituted adoptive
admissions that the defendant was parked in the car from which the
fatal gunshot was fired. The trial court ultimately determined that the
recordings were admissible. The jury returned its verdict in the early
afternoon on March 12, 2020. On that same date, at an unspecified time,
the chief court administrator of the Judicial Branch, in response to the
emerging COVID-19 pandemic, issued an order, providing that, with the
exception of jury trials currently in progress and certain criminal trials,
"all jury trials, civil and criminal, are suspended for the next [thirty]
days." At the defendant's sentencing in August, 2020, the trial court
heard arguments on the defendant's motion for a new trial, in which
he argued that a new trial was warranted in view of the prejudicial
impact that the pandemic had on jury deliberations. The defendant
specifically argued that the chief court administrator's order in response
to the pandemic pressured the jurors to deliberate in a hurried fashion,
effectively abridging his constitutional right to a fair and impartial jury.
The trial court ultimately denied the defendant's new trial motion. On
appeal from the judgment of conviction, *held*:

1. The record was inadequate to review the defendant's unpreserved claim
   that the trial court improperly admitted into evidence the recordings of
   the phone calls that the defendant had made to L from his holding cell
   after his arrest on the ground that the recordings contained evidence
   of the defendant's postarrest silence, in violation of *Doyle* v. *Ohio* (426
   U.S. 610):

   The successful assertion of a *Doyle* violation requires that the record
   contain certain factual predicates, including an indication that the defen-
   dant's postarrest silence was preceded by the receipt of warnings in
   accordance with *Miranda* v. *Arizona* (384 U.S. 436), there was nothing
   in the record to confirm that the defendant did receive *Miranda* warnings
   prior to the contested phone conversations, and, accordingly, the record
   was devoid of a predicate necessary to assert a *Doyle* violation.

2. The trial court improperly instructed the jury on combat by agreement,
   a statutory (§ 53a-19 (c) (3)) exception to self-defense, as there was
   insufficient evidence presented at trial to warrant such an instruction,
   but the error was harmless beyond a reasonable doubt:

   This court's review of the record revealed no evidence presented at trial
   that would have allowed the jury to reasonably infer that the defendant
   and the victim had engaged in combat by agreement, and, although the
   state presented evidence to support its theory that the defendant and the

victim had a bad relationship, the existence of ill will between persons, without more, is insufficient to warrant a combat by agreement instruction.

Moreover, the evidence presented at trial did not provide support for even an implied agreement to engage in combat, as the record was devoid of any indication that the victim or the defendant had been embroiled in an ongoing controversy prior to the shooting, and it was unclear from the record whether the defendant even knew that the victim was living in Connecticut at the time of the incident.

Nevertheless, the trial court's improper instruction on combat by agreement reasonably could not be said to have misled the jury, as the jury's verdict depended on a determination of whether it was the defendant or the victim who pulled out his weapon and fired first, and, because the verdict could be fairly read to indicate a choice between two inconsistent versions of the shooting, namely, acceptance of the state's version of the shooting and rejection of the defendant's claim of self-defense, the principal factual issues to be decided by the jury were not dependent on the subtleties of the law of self-defense for their proof.

3. This court either declined to review or rejected the defendant's claims that the prosecutor had committed certain improprieties during portions of his closing argument, in violation of the defendant's due process right to a fair trial:

The record was inadequate to review the defendant's claim that the prosecutor's reference, during closing argument, to the defendant's phone calls to L was improper on the ground that it drew attention to the defendant's post-*Miranda* silence, in violation of *Doyle*, this court having previously concluded that there was nothing in the record to indicate that the defendant had received *Miranda* warnings prior to his placing of those phone calls.

There was no merit to the defendant's claim that the prosecutor improperly had commented on facts not in evidence when, during closing argument, he stated that "the defendant had his gun out when he opened [the] car door," and that, "[i]f you go . . . frame by frame, you'll see that," as these comments constituted a reasonable inference based on the evidence presented at the trial.

The prosecutor's comments, made during closing argument and in connection with his explanation of the combat by agreement exception to self-defense, that "[the victim] appear[ed] to be a man walking [toward the defendant's car] with a purpose," that the defendant and the victim decided, "[t]oday was the day . . . that we end this," and that "[w]e're going to do this right here, right now," did not constitute prosecutorial impropriety, as the trial court had concluded, albeit erroneously, that the evidence warranted an instruction on combat by agreement, and the prosecutor had the concomitant right to argue, and proceeded on the reasonable assumption at that time, that combat by agreement between the defendant and the victim was supported by the evidence.

4. This court declined to review the defendant's claim that the trial court improperly denied his motion for a new trial, which was based on his claim that the COVID-19 pandemic had adversely affected the jurors' deliberations by pressuring them to deliberate in a hurried fashion, thereby depriving him of his right to a fair and impartial jury, as the defendant failed to provide an adequate record for appellate review:

Although the jurors returned their verdict on the same day that the chief court administrator issued the order suspending jury trials that were not ongoing, the defendant presented no evidence that the order was issued before the jurors returned their verdict or that the jurors were aware of, or impacted by, that order, and there otherwise was no indication that the jurors' deliberations were impacted by the pandemic, generally, or the suspension order, specifically.

Moreover, after the jurors returned their verdict, but before they were discharged, the trial court explicitly asked the parties whether they would like the court to "address the jury further," and, at that point, if the defendant or defense counsel believed that the jurors felt rushed to reach a verdict in light of the pandemic, it was incumbent on counsel to timely alert the trial court regarding that concern.

Argued April 28—officially released November 15, 2022

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of murder, criminal possession of a pistol or revolver, and carrying a pistol or revolver without a permit, and, in the second part, with being a persistent felony offender, brought to the Superior Court in the judicial district of Fairfield, where the first part of the information was tried to the jury before *Hernandez, J.*; verdict of guilty of the lesser included offense of intentional manslaughter in the first degree with a firearm, and of criminal possession of a pistol or revolver and carrying a pistol or revolver without a permit; thereafter, the defendant was presented to the court, *Alexander, J.*, on a plea of nolo contendere to the second part of the information; subsequently, the court, *Hernandez, J.*, rendered judgment of guilty in accordance with the verdict and plea, from which the defendant appealed. *Affirmed.*

*Stephen A. Lebedevitch*, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Michael A. DeJoseph*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Jayvell Washington, appeals from the judgment of conviction, rendered after a jury trial, of one count each of intentional manslaughter in the first degree with a firearm, criminal possession of a pistol or revolver, and carrying a pistol or revolver without a permit. On appeal, the defendant claims that (1) the trial court erred when it in admitted into evidence recordings of phone calls that the defendant made while incarcerated, thereby permitting the state to use the defendant's postarrest silence against him, (2) the trial court erred when it instructed the jury regarding adoptive admissions and combat by agreement, respectively, (3) the prosecutor committed improprieties during certain portions of his closing argument, and (4) the trial court erred in denying the defendant's motion for a new trial, in light of fact that the COVID-19 pandemic impacted the jury's deliberations.[1] Although we conclude that the majority of the defendant's claims are without merit, we agree with his contention that the trial court improperly instructed the jury on combat by agreement, as there was insufficient evidence presented at trial to warrant the instruction. We nevertheless conclude that the error was harmless and, accordingly, affirm the judgment of conviction.

The jury reasonably could have found the following facts. In January, 2019, the defendant drove a blue Mini Cooper to a Citgo gas station in Bridgeport. He parked directly in front of the gas station, facing away from the building and toward Reservoir Avenue. Video surveillance showed the defendant enter the gas station, purchase some items, and return to the driver's seat of the Mini Cooper. No one other than the defendant entered or exited the Mini Cooper while it was parked at the gas station.

Shortly after the defendant returned to the vehicle, the victim, Eugene Rogers, walked down Reservoir Avenue toward the gas station. The victim walked along the sidewalk adjacent to the gas station and strode directly toward the Mini Cooper. When he reached the Mini Cooper, the victim stopped briefly and, from a few feet away, attempted to see through the tinted windows of the defendant's car. The surveillance footage then showed the driver's side car door open. The victim drew a gun from the waistband of his pants, and both the defendant and the victim fired shots toward each other. The victim fired one shot toward the defendant. The defendant fired four shots at the victim, one of which proved to be fatal. After the shots were fired, the defendant closed the door of the Mini Cooper and drove away. He was later apprehended by law enforcement in Bridgeport.

The defendant was charged with one count each of murder, criminal possession of a pistol or revolver, and

carrying a pistol or revolver without a permit.[2] At trial, defense counsel advanced two theories of defense. First, he argued that the defendant was not the shooter; although defense counsel conceded that the defendant was present at the Citgo gas station, in the Mini Cooper, at the time of the shooting, defense counsel argued that the state had failed to adduce sufficient evidence at trial to prove the defendant's identity as the shooter beyond a reasonable doubt. Alternatively, defense counsel claimed that the defendant killed the victim in self-defense. The defendant was found guilty of the lesser included offense of intentional manslaughter in the first degree with a firearm, and of criminal possession of a pistol or revolver and carrying a pistol or revolver without a permit. The trial court sentenced the defendant to a total effective sentence of forty years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

We first consider the defendant's claim that the trial court improperly admitted into evidence recordings of phone calls that the defendant made to his sister, Lorvita Washington, from the holding area of the Bridgeport Police Department after his arrest, thereby permitting the state to use his postarrest silence during those calls against him, in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

The following additional facts are relevant to our analysis. On the third day of trial, outside the presence of the jury, the trial court heard arguments from both parties regarding the admissibility of two recorded phone calls that the defendant made to Lorvita from a holding cell at the Bridgeport Police Department on the morning after he had been arrested and booked. The recordings of the phone calls captured conversations between the defendant, Lorvita, and two male acquaintances. In the first call, Lorvita and one of the male acquaintances informed the defendant that they were watching video footage of the shooting as they were speaking with him. Lorvita asked the defendant, "that you in the car?" The defendant did not respond but subsequently stated, "yeah, right?" Lorvita then laughed. During the second call, while Lorvita and one of the male acquaintances described the footage aloud to the defendant—mentioning that the victim approached the Mini Cooper on foot and looked into the car to see if the defendant was in the car, and that the victim then "saw [the defendant] had it" and tried to run away—the defendant intermittently repeated "yeah" and "right" throughout their description. The defendant did not otherwise comment on Lorvita's or the male acquaintance's characterization of the shooting.

Defense counsel made a number of evidentiary objections to the admissibility of the phone call recordings; he argued that the contents of the recordings were

irrelevant, their admission would be more prejudicial than probative, and they contained inadmissible hearsay. In response, the prosecutor argued that the contested phone call recordings were admissible because certain portions of the calls, particularly those in which the defendant failed to deny that he was in the car from which shots were fired that killed the victim, constituted adoptive admissions. Furthermore, in response to defense counsel's claim that the statements were more prejudicial than probative, the prosecutor argued: "I am hard-pressed . . . to think of something that is more probative than something that places the defendant not only at the scene of the crime, but [also] in the car from which the shots that killed [the victim] were fired."

The trial court agreed with the state. The court first found that the statements were relevant. The court also concluded that the statements constituted adoptive admissions because "[t]he defendant does not deny that [it was he in the Mini Cooper parked in the Citgo gas station parking lot]. Ordinarily, when people are confronted with damaging information either about their criminal involvement or reputation, they . . . generally tend to deny it. The defendant . . . does not deny it . . . ." Finally, the court found that the recordings of the phone calls were "highly probative, not only of identification, which has been squarely placed at issue by the defense in this case, but . . . [they also illuminate] the question of who fired [the] gun." Accordingly, the court denied the defendant's motion in limine to preclude the recordings of the phone calls.

On appeal, the defendant abandons his evidentiary objections to the admission of the recordings. Instead, for the first time, he argues that, in admitting the recordings, the trial court violated *Doyle*, insofar as it allowed the defendant's postarrest silence to be used against him as an adoptive admission.[3] The state argues that the record is inadequate to review the purported *Doyle* violation. Specifically, the state argues that the record is devoid of certain factual predicates necessary to permit review of the defendant's *Doyle* claim, namely, that (1) the defendant had received his *Miranda* warnings[4] before he made the phone calls at issue, and (2) any pauses in the conversation were triggered by an affirmative invocation of the defendant's right to remain silent. We agree with the state.

Although defense counsel objected to the admission of the recordings at trial, the bases of his objection were evidentiary in nature. Counsel did not raise a *Doyle* violation at trial, and, therefore, the defendant seeks review of this claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all*

of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40; see *In re Yasiel R.*, supra, 781 (modifying third prong of *Golding*). It is well settled that it is the defendant's responsibility to provide a record that is adequate for appellate review. See *State* v. *Golding*, supra, 240.

In *Doyle* v. *Ohio*, supra, 426 U.S. 610, the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. See id., 611, 619. In reaching its conclusion, the court in *Doyle* v. *Ohio*, supra, 617–19, reasoned, first, that "silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value," and, "[s]econd . . . [although] it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." (Internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 765, 931 A.2d 198 (2007); accord *State* v. *Patrick M.*, 344 Conn. 565, 582, 280 A.3d 461 (2022). In a subsequent case, the United States Supreme Court went on to explain that "[t]he point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." *Wainwright* v. *Greenfield*, 474 U.S. 284, 292, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986).

Although *Doyle* explicitly prohibits *impeachment* of a defendant with evidence of his post-*Miranda* silence, this court has extended the *Doyle* rationale to conclude that due process is also violated when the state uses evidence of a defendant's post-*Miranda* silence "as *affirmative proof* at trial . . . ." (Emphasis added.) *State* v. *Plourde*, 208 Conn. 455, 468, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989); accord *State* v. *Montgomery*, 254 Conn. 694, 714, 759 A.2d 995 (2000). "With respect to post-*Miranda* warning[s] . . . silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." (Internal quotation marks omitted.) *State* v. *Berube*, 256 Conn. 742, 751, 775 A.2d 966 (2001).

In order to successfully assert a *Doyle* violation, the record must contain certain factual predicates, including an indication that the defendant's silence was pre-

ceded by the receipt of *Miranda* warnings. See, e.g., *Wainwright* v. *Greenfield*, supra, 474 U.S. 292 ("[t]he point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony"). This is because the "use at trial of silence *prior* to the receipt of *Miranda* warnings does not violate due process." (Emphasis in original.) *State* v. *Plourde*, supra, 208 Conn. 466. Indeed, in *Fletcher* v. *Weir*, 455 U.S. 603, 607, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982), "the United States Supreme Court held that the absence of any indication in the record that the silence of a defendant had been preceded by a *Miranda* warning render[s] *Doyle* inapplicable . . . ." *State* v. *Leecan*, 198 Conn. 517, 524–25, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986); see also, e.g., *State* v. *Berube*, supra, 256 Conn. 751–52 (when record was not clear as to whether defendant's conversations with police transpired after or before his arrest or receipt of *Miranda* warnings, this court would not infer that defendant received *Miranda* warnings prior to those conversations simply by virtue of fact that he was in custody when he called his attorney); *State* v. *Leecan*, supra, 531 (record did not indicate that defendant ever received *Miranda* warnings, which is necessary predicate for reliance on *Doyle*).

The defendant, in this case, contends that, when he made the phone calls at issue, he "was in [police] custody . . . and had received his *Miranda* warnings . . . ." There is nothing in the record, however, that confirms that the defendant did, in fact, receive *Miranda* warnings prior to the contested phone conversations.[5] In *State* v. *Leecan*, supra, 198 Conn. 517, we declined the defendant's request to "take judicial notice of the probability that at some point between his arrest and his trial he would have been advised of his constitutional right to remain silent and told that his silence could not be used against him." Id., 531. Similarly, here, in the absence of a record demonstrating the same, we decline to infer that the defendant received *Miranda* warnings prior to the time he made the phone calls at issue. See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006) ("[I]t is incumbent [on] the [defendant] to take the necessary steps to sustain [his] burden of providing an adequate record for appellate review. . . . Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative." (Internal quotation marks omitted.)), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

Accordingly, because the record is devoid of a predicate necessary to assert a *Doyle* violation, we conclude

that the record is inadequate to review this unpreserved claim.

## II

We turn next to the defendant's claim of instructional error. The defendant claims, among other things, that the trial court erred in giving an instruction on combat by agreement, as there was insufficient evidence adduced at trial to support such a charge.[6] Although we agree with the defendant that the trial court erred when it gave an instruction on combat by agreement, we conclude that its error was harmless beyond a reasonable doubt.

The following additional facts are relevant to our analysis. During the charge conference, defense counsel raised an exception to the trial court's proposed instruction on illegal combat by agreement, arguing that there was "no evidence in the record from which the jury [could] draw such an inference." The prosecutor disagreed, arguing that there was "ample . . . evidence [from which] the jury [could] make that finding." Specifically, the prosecutor contended that there was "testimony about a bad relationship between the defendant and [the victim]."

In discussing the matter, the trial court referenced the testimony of Reimonund Figueroa, a friend of the victim, who testified that he was with the victim the morning before the shooting. Figueroa testified that the victim drove him past the Citgo gas station, in a Volvo, and that Figueroa saw the defendant's Mini Cooper parked at the gas station. The trial court inquired: "If the jury were to believe . . . Figueroa that . . . [the victim] drove through . . . the gas station, [the defendant] remained at the gas station, and then [the victim] came back, and they exchanged gunfire, couldn't . . . somebody from that infer that they were sort of waiting for each other, sort of a shoot-out at the O.K. Corral situation?" Defense counsel conceded that, if the jury accepted those facts, "that could be an inference drawn." The prosecutor went on to add: "[I]f [the jury] could accept that [the victim] was driving [the] Volvo—you have the Volvo come into the gas station, stop in front of the blue Mini Cooper . . . leave [the gas station], and then [the victim] come back on foot. . . . And then you have [the victim] walking with . . . a purpose, [based] on that [surveillance footage], down to the [Mini Cooper], doesn't stop at the door to the store, and [the jury] watches, in real time, [as] the car door opens, and the shots go back and forth. So, I think, based [on] the evidence [before] the jury . . . there's ample evidence to support a finding of combat by agreement . . . ." Defense counsel countered that "there was no evidence put forward that [the defendant] had any knowledge of the car that [the victim] might've been driving, [and] there was no evidence put forth that established that [the defendant] even knew that [the

victim] was in the state of Connecticut . . . ." Accordingly, defense counsel stood by the exception.

The next day, the trial court instructed the jury on combat by agreement. Its charge provided in relevant part: "The statute defining self-defense describes certain circumstances in which a person is not justified in using any degree of physical force in self-defense against another. One such circumstance is that a person is not justified in using any degree of physical force [on] another person in self-defense . . . when the physical force is the product of an illegal combat by agreement. Under this provision, it is not necessary that there be a formal agreement. [An illegal combat by agreement] may be inferred from the conduct of the parties. To infer such an agreement, you must look at all the circumstances leading up to and preceding the event in question, as well as all of the other circumstances surrounding this event, itself, based on the entire evidence and your own credibility assessments. It is important to remember that the defendant has no burden whatsoever to prove that his use of physical force was not the product of a combat by agreement. To the contrary, you may only reject his defense [of self-defense] on the basis of this statutory disqualification if you find that the state has proved beyond a reasonable doubt [that] the defendant and [the victim] had engaged in combat by agreement."

On appeal, the defendant argues that the trial court erred in instructing the jury on combat by agreement because there was insufficient evidence adduced at trial to warrant such a charge. The state disagrees, contending that there was sufficient evidence at trial to permit "the jury to infer that the defendant and the victim knew of each other's presence at the Citgo [gas station] and tacitly agreed to a shoot-out." Alternatively, the state argues, even if the trial court erred by instructing the jury on combat by agreement, any error was harmless.

The standard of review and relevant legal principles are not in dispute. "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 599, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

"An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . [T]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In determining whether the jury was misled, [i]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect [on]

the jury in guiding [it] to a correct verdict in the case. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Amado*, 254 Conn. 184, 194, 756 A.2d 274 (2000).

The instruction at issue in this case, combat by agreement, "is an exception that operates as a statutory disqualification from the justification defense of self-defense. A jury instruction regarding the combat by agreement exception to self-defense is warranted when the evidence is sufficient to support a reasonable inference that such a mutual combat occurred. . . . The agreement required by . . . [General Statutes] § 53a-19 (c) (3) need not be formal or express." (Citation omitted; internal quotation marks omitted.) *State* v. *O'Bryan*, 318 Conn. 621, 637, 123 A.3d 398 (2015). "Such an agreement may be tacit and inferred from the facts and circumstances of the case." Id.; see also, e.g., *State* v. *Montanez*, 277 Conn. 735, 747–48, 894 A.2d 928 (2006) (combat by agreement instruction was proper, despite absence of direct evidence of agreement to fight, when defendant's friend urged victim to fight with defendant, and that victim subsequently returned with his brother, who offered to fight defendant's friend " 'man-to-man' ").

In analyzing this claim, we are mindful that "[t]he [trial] court . . . has a duty not to submit to the jury, in its charge, any issue [on] which the evidence would not reasonably support a finding." (Internal quotation marks omitted.) *State* v. *Beltran*, 246 Conn. 268, 274, 717 A.2d 168 (1998). Accordingly, we review the entirety of the evidence adduced at trial in order to determine whether there had been a sufficient basis from which the jury reasonably could have concluded that the defendant and the victim had engaged in an illegal combat by agreement. See, e.g., *State* v. *Whitford*, 260 Conn. 610, 625, 799 A.2d 1034 (2002).

Our review of the record reveals that no evidence presented at trial would have allowed the jury to reasonably infer that the defendant and the victim had engaged in combat by agreement. The majority of the defense's evidence concerning the shooting centered on the theory that the defendant was not the shooter and was, therefore, irrelevant to the justification of self-defense. The only evidence presented to support the defendant's alternative theory of self-defense was the surveillance footage, which, according to the defense, showed the victim pulling out a gun first and pointing it toward the Mini Cooper. Given the evidence presented by the defense, the jury reasonably could not have determined that the defendant and the victim had engaged in a combat by agreement.

The state's evidence, likewise, did not offer sufficient support for the combat by agreement instruction. Although the state presented evidence to support its

theory that there existed "bad blood" between the defendant and the victim, the existence of ill will between persons, without more, is insufficient to warrant a combat by agreement instruction. But cf. *State* v. *Silveira*, 198 Conn. 454, 471, 503 A.2d 599 (1986) (combat by agreement instruction was proper when, among several other factors that would indicate implicit agreement to combat—including testimony indicating that altercation embroiled in front of bar between defendant's group and bar patron, and, following altercation, bar patron returned with friends who "converge[d] on the defendant's group, with the resulting acceleration of hostilities"—there existed history of violence between defendant's group and bar patron's group).

The state nevertheless contends that its video and testimonial evidence, along with additional footage presented by the defense—which established that, two minutes after the defendant first arrived at the Citgo gas station, the victim drove by in a blue Volvo while the defendant was sitting in his parked Mini Cooper, facing the road—combined with evidence of the victim's swift walk toward the gas station and deliberate stride toward the defendant's car, somehow indicates that the defendant and the victim "knew of each other's presence and implicitly agreed to illegal mutual combat by gunfire." We disagree.

Although our case law provides that an illegal combat by agreement need not be express and "may be tacit and inferred from the facts and circumstances of the case"; *State* v. *O'Bryan*, supra, 318 Conn. 637; the evidence presented at trial does not provide support for even an implied agreement to combat in this case. The record is devoid of any indication that the victim or the defendant had been embroiled in an ongoing controversy prior to the shooting, a scenario which, in prior cases, has led our appellate courts to conclude that there was sufficient evidence to support a combat by agreement instruction. See, e.g., *State* v. *Montanez*, supra, 277 Conn. 747–48; *State* v. *Silveira*, supra, 198 Conn. 471; *State* v. *Morales*, 172 Conn. App. 329, 344–45, 160 A.3d 383, cert. denied, 327 Conn. 988, 175 A.3d 1244 (2017); *State* v. *Johnson*, 53 Conn. App. 476, 481–82, 733 A.2d 852, cert. denied, 249 Conn. 929, 733 A.2d 849 (1999). In fact, it is even unclear whether the defendant had knowledge of the fact that the victim was living in Connecticut at the time of the incident, as the victim had returned only months before the shooting, after residing out of state for approximately eight years. Accordingly, because our review of the record fails to identify any evidence from which the jury reasonably could find the existence of a combat by agreement, we conclude that the trial court's instruction was improper.

Having concluded that the trial court's instruction on illegal combat by agreement was improper, we turn to the question of harmlessness. Our analysis of this issue

is largely controlled by our decision in *State* v. *Quintana*, 209 Conn. 34, 547 A.2d 534 (1988). In *Quintana*, we concluded that the trial court's instruction on self-defense, which misstated the law governing the duty to retreat, was erroneous but nevertheless harmless. See id., 46. In conducting our harmlessness analysis, we concluded that "the evidence presented to the jury [could] fairly be said to center on the credibility of [the defendant's former girlfriend's] . . . version of the stabbing, measured against the credibility of [the testimony of a state's witness] that an attempted robbery was the motivating force behind the stabbing. The jury's verdict [could] fairly be read to indicate a choice between these two inconsistent versions of the stabbing, a choice that accepted the version presented by [the state's witness] . . . and rejected the self-defense version presented by [the defendant's former girlfriend]." Id., 47. We further noted that "[t]he principal factual issues, therefore, were not classically dependent [on the subtleties of the law of self-defense] for their proof, as is true in cases [in which] the principal factual issue is the . . . [defendant's subjective knowledge of the availability of safe escape]"; (internal quotation marks omitted) id., 47–48; and, accordingly, we concluded that the trial court's erroneous instruction on self-defense did not constitute reversible error. Id., 48; see also, e.g., *State* v. *Whitford*, supra, 260 Conn. 628–29 (although trial court's instruction on duty to retreat was erroneous, it was nevertheless harmless because jury's verdict could fairly be read as credibility determination that rejected defendant's self-defense version of stabbing and accepted version presented by state, namely, that defendant attacked victim of his own volition). In short, an instructional error may be harmless when a jury's verdict hinges on a credibility determination, rather than on the subtleties of the law on which the trial court erroneously instructed the jury.

In this case, the defendant, who did not testify at trial, sought to establish his self-defense claim solely through the surveillance camera footage that captured the shooting, claiming that the footage showed that the victim fired first. The state, too, looked to the surveillance footage to disprove the defendant's theory of self-defense, arguing that it showed that the defendant was the initial aggressor. This footage, coupled with the phone call from the holding cell in which the defendant adoptively admitted a male acquaintance's comment that "[the victim] backed up when he seen you had it," the state argued, supported its theory that the defendant did not act in self-defense. Because the surveillance camera was positioned at such an angle that it was impossible to see who drew his weapon first, and there was no eyewitness testimony presented to corroborate either party's account, the jury was ultimately faced with determining, based on its interpretation of the surveillance footage and phone recordings, whether it

was the defendant or the victim who pulled out his weapon and fired first. Because, similar to *Quintana*, the jury's verdict could be fairly read to indicate a choice between two inconsistent versions of the shooting, a choice that accepted the version presented by the state and rejected the self-defense theory presented by the defendant, "[t]he principal factual issues . . . were not classically dependent [on the subtleties of the law of self-defense] for their proof . . . ." (Internal quotation marks omitted.) *State* v. *Quintana*, supra, 209 Conn. 47–48.

In light of the foregoing, we conclude that the trial court's improper instruction on combat by agreement reasonably cannot be said to have misled the jury. Accordingly, we conclude that the trial court's error was harmless beyond a reasonable doubt.

III

We next address the defendant's claim that the prosecutor committed improprieties during certain portions of his closing argument, thereby depriving the defendant of his due process right to a fair trial.[7] We disagree.

The following additional facts are relevant to our resolution of this claim. During closing argument, the prosecutor briefly explained that the state could defeat the defendant's claim of self-defense by disproving any one of the four components that make up the defense.[8] The prosecutor went on to argue, first, that the evidence did not support that "the defendant had an actual belief that the use of physical force was imminent." See footnote 8 of this opinion. The prosecutor, referencing the surveillance footage, asked the jury to look at "the frame by frame." This footage, together with the phone call from the holding cell at the Bridgeport Police Department in which the defendant adoptively admitted a male acquaintance's observation that "[the victim] backed up when he seen you had it," the prosecutor argued, supported an "inference . . . [that] the defendant already had a gun out when he started opening the door of the Mini Cooper." The prosecutor went on to argue that the same evidence disproved the second component of the self-defense claim, namely, that the defendant had a "reasonable belief" that physical force was imminent. See footnote 8 of this opinion. The prosecutor specifically said: "[T]he evidence supports a finding that the defendant had his gun out when he opened [the] car door. If you go . . . frame by frame, you'll see that."

Later, the prosecutor explained the various statutory disqualifiers that preclude a finding of self-defense. One such disqualifier, he explained, was combat by agreement. The prosecutor claimed that the evidence presented at trial indicated that the shooting was the result of combat by agreement. The prosecutor argued in relevant part: "You look at that video, and you see [the

victim] coming down Reservoir Avenue. [The victim] appears to be a man walking with a purpose, and he doesn't stop at the door to go into the store; he makes a beeline right for that Mini Cooper . . . . [The victim] looks into that car and, before he can pull, the car door starts opening, and the shots start flying. . . . So, a reasonable inference . . . is that the defendant and [the victim] decided: '[T]oday was the day . . . that we end this . . . . [W]e're going to do this right here, right now.' . . . [A]nd the shots start flying."

Defense counsel did not object to the prosecutor's statements during trial. The defendant now claims, however, that three statements made during closing argument violated his due process right to a fair trial, insofar as the prosecutor, in two instances, referred to facts not in evidence and, in a third instance, drew attention to the defendant's post-*Miranda* silence, in violation of *Doyle*. For the same reasons that we conclude that the record is inadequate to review the defendant's *Doyle* claim; see part I of this opinion; we conclude that the defendant's prosecutorial impropriety claim alleging a *Doyle* violation is also unreviewable. Accordingly, we confine our analysis to the two remaining contested portions of the prosecutor's closing argument. The defendant specifically takes issue with the following statements made by the prosecutor: (1) "[T]he defendant had his gun out when he opened [the] car door. If you go . . . frame by frame, you'll see that." And (2) "[the victim] appears to be a man walking with a purpose . . . . [T]he defendant and [the victim] decided: '[T]oday was the day . . . that we end this . . . . [W]e're going to do this right here, right now.' . . . [A]nd the shots start flying."

We begin with the applicable standard of review and guiding legal principles. It is well established that "a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Gould*, 290 Conn. 70, 77, 961 A.2d 975 (2009).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed

for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) Id., 78–79.

We have thoroughly reviewed the record and conclude that the prosecutor neither improperly characterized the evidence nor assumed facts not in evidence but, instead, permissibly commented on the evidence presented at trial and the reasonable inferences that may be drawn therefrom.

With regard to the first contested portion of closing argument, before he commented that "the defendant had his gun out when he opened [the] car door," and that, "[i]f you go . . . frame by frame, you'll see that," the prosecutor recounted the surveillance footage, which was shown to the jury multiple times over the course of the trial. The prosecutor also mentioned the phone call between the defendant, Lorvita, and the male acquaintances while the defendant was in the holding cell at the Bridgeport Police Department, during which one of the male acquaintances commented, "[the victim] backed up when he seen you had it." The totality of the evidence, the prosecutor argued, supported an "*inference* . . . [that] the defendant already had a gun out when he started opening the door of the Mini Cooper." (Emphasis added.) The prosecutor then went on to reiterate that, if the jurors looked at the footage frame by frame, they would see just that, namely, that "the defendant had his gun out when he opened [the] car door." Because we conclude that this was a reasonable inference based on evidence presented at trial, we conclude that this comment was not improper. See, e.g., *State* v. *Courtney G.*, 339 Conn. 328, 353, 260 A.3d 1152 (2021) ("[I]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the [jurors] the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.)).

Subsequently, when explaining the statutory disqualifier of combat by agreement, the prosecutor commented that "[the victim] appears to be a man walking with a purpose . . . . [T]he defendant and [the victim]

decided: '[T]oday was the day . . . that we end this . . . . [W]e're going to do this right here, right now.' . . . [A]nd the shots start flying." On appeal, the defendant argues that "[t]he record is devoid of any evidence that would support this argument." We agree with the defendant that there was insufficient evidence adduced at trial to warrant an instruction on combat by agreement. See part II of this opinion. Nevertheless, we simultaneously recognize that, at the time the prosecutor made his closing argument, he reasonably assumed—based on the proposed jury instructions, the conversation between him, defense counsel, and the trial court during the charge conference, and the final instructions that were provided to him and defense counsel prior to the court's instructions to the jury—that the trial court would give a combat by agreement instruction. See, e.g., *State* v. *Fauci*, 282 Conn. 23, 45, 917 A.2d 978 (2007) (when reviewing claims of prosecutorial impropriety, appellate court does not scrutinize each comment made by prosecutor in vacuum, but, rather, court must review comments complained of in context of entire trial). The prosecutor, drawing on the facts in the record, argued that the evidence permitted the jury to infer that the shooting was the result of an illegal combat by agreement. In making this argument, the prosecutor did not—as the defendant contends—assume facts not in evidence but, rather, "comment[ed] [on] the evidence presented at trial and . . . argue[d] the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 583, 849 A.2d 626 (2004).

The prosecutor's argument was further informed by the discussion between the trial court, the prosecutor, and defense counsel during the charge conference, which occurred the day prior. During that conversation, the trial court inquired: "If the jury were to believe . . . Figueroa that . . . [the victim] drove through . . . the [Citgo] gas station, [the defendant] remained at the gas station, and then [the victim] came back, and they exchanged gunfire, couldn't . . . somebody from that infer that they were sort of waiting for each other, sort of a shoot-out at the O.K. Corral situation?" Defense counsel conceded that, if the jury accepted those facts, "that could be an inference drawn." Although defense counsel ultimately objected to the combat by agreement instruction, initially, during the charge conference, he conceded that, if the jury were to find certain facts—the very facts the prosecutor argued in the contested portion of his closing argument—an inference could be drawn to support the notion that the defendant and the victim had engaged in an illegal combat by agreement. Given the "generous latitude" afforded to counsel during closing argument; (internal quotation marks omitted) *State* v. *Gould*, supra, 290 Conn. 78; coupled with the well settled notion that a prosecutor may make comments on the evidence adduced at trial and reason-

able inferences that may be drawn therefrom; see, e.g., *State* v. *Courtney G.*, supra, 339 Conn. 353; *State* v. *Stevenson*, supra, 269 Conn. 583; we conclude that these comments did not constitute prosecutorial impropriety.

Although we acknowledge that this conclusion, on the surface, appears in tension with our conclusion, in part II of this opinion, that the trial court improperly instructed the jury on combat by agreement, we cannot conclude that the prosecutor's statements during closing argument amounted to impropriety. The defendant's prosecutorial impropriety claim must be addressed in context, which, in this case, includes the trial court's conclusion that the evidence warranted the charge on combat by agreement. Given that the trial court concluded that the charge was proper, the prosecutor plainly had the concomitant right to argue that it was supported by the evidence. Given that the prosecutor was arguing based on evidence admitted at trial and his reasonable assumption, at the time, that the evidence was sufficient to support the combat by agreement instruction, we conclude that the prosecutor's comments during closing argument were not improper.

IV

Finally, we turn to the defendant's claim that the trial court erred in denying his motion for a new trial, in which he alleged that the COVID-19 pandemic had adversely affected the jury's deliberations, thereby depriving him of his right to a fair and impartial jury.

The following additional facts are relevant to our resolution of this claim. The jury began its deliberations on March 10, 2020, and returned its verdict on March 12, 2020, at 12:10 p.m. Before discharging the jury from service, the trial court asked whether either party would like the court to "address the jury further . . . ." Both the prosecutor and defense counsel responded in the negative. Sentencing was scheduled for April 24, 2020.

The COVID-19 pandemic ultimately delayed the defendant's sentencing. In response to the global pandemic, on March 10, 2020, Governor Ned Lamont declared public health and civil preparedness emergencies throughout the state. As a result of Governor Lamont's declaration, on March 12, 2020, at an unspecified time, Judge Patrick L. Carroll III, the chief court administrator of the Judicial Branch, issued a statement to all Judicial Branch employees, stating in relevant part: "*With the exception of jury trials currently in progress* and criminal jury trials necessitated by the filing and granting of a speedy trial motion, all jury trials, civil and criminal, are suspended for the next [thirty] days." (Emphasis added.) Judge Carroll further stated that, beginning on March 16, 2020, the courts would be "scheduling and hearing only those matters identified as 'Priority 1 Business Functions.' " A similar message was posted on the Judicial Branch website at

an unspecified time that same day.

On March 19, 2020, Governor Lamont issued Executive Order No. 7G, which provided in relevant part that, "in consultation with the Chief Court Administrator on behalf of the Chief Justice of the Supreme Court and the Judicial Branch, I have determined that there exists a compelling state interest that courts conduct only essential business in order to minimize the spread of COVID-19 . . . ." Executive Order No. 7G (March 19, 2020). Governor Lamont went on to suspend "[noncritical] [c]ourt [o]perations and [a]ssociated [r]equirements." Id.

Ultimately, the defendant's sentencing occurred on August 21, 2020. On that date, the trial court heard arguments on the defendant's motion for a new trial, filed on July 6, 2020, in which he argued that a new trial was warranted based on the prejudicial impact of the COVID-19 pandemic on jury deliberations. Specifically, the defendant contended that "orders imposed by the Judicial Branch and the Executive Branch in response to the rapidly spreading virus during the jury's deliberations in this matter undoubtedly pressured the jury to deliberate in a hurried fashion," effectively abridging his constitutional right to a fair and impartial jury. The state did not file a written objection to the defendant's motion. During argument, however, the prosecutor objected to the motion on a number of grounds: first, that it was untimely; second, that the defendant or his counsel should have, but failed to, raise this issue during jury deliberations; third, that the jury returned its verdict on March 12, 2020, the very day that new trials were suspended, and there was no indication, from the record, that the jury knew of the suspension order; and, fourth, that the suspension order only applied to new jury trials and exempted those, like the defendant's, that were already in progress.

The trial court denied the defendant's motion for a new trial. The court determined that the motion was untimely. With respect to the substance of the motion, the court found that there was "no evidence before the court that the jury's deliberations were in any way impacted by the [March 12, 2020] order suspending trials. In fact, it's not even clear from the motion for a new trial . . . at what time on March 12, 2020, [Judge Carroll] issued his order suspending trials. Also, a plain-faced reading of the order, in the court's view, does not create a substantive or procedural right for [the defendant] to have his trial suspended. Finally, throughout the trial, the court reminded the [jurors] not to read any press coverage or any press [that] would in any way impact their abilities to deliberate. . . . [T]he court assumes that the [jurors] followed the court's instructions on avoiding any sort of press coverage. And, if they had in any way been affected by [Judge Carroll's] declaration, I'm confident that they would

have brought it to the court's attention. And, also, obviously, [because] there is no evidence that [the jurors'] deliberations were in any [way] affected by [Judge Carroll's] order, the motion for a new trial is denied."

On appeal to this court, the defendant argues that the trial court improperly denied his motion for a new trial. First, the defendant contends that, although his motion was not filed within five days of the verdict, as required by Practice Book § 42-54, we should nevertheless conclude that his motion was timely in light of the fact that many statutory time limitations were suspended due to the COVID-19 pandemic. With respect to the substance of the motion, the defendant further contends that the pandemic impacted the ability of jurors to be impartial during their deliberations and their ability to focus on the trial, thereby violating his constitutional right to a fair and impartial jury. The state disagrees, arguing that the trial court properly denied the defendant's motion as untimely. Beyond that, the state claims that the remainder of the defendant's arguments regarding the impacts of the COVID-19 pandemic on the jurors' deliberative processes are unreviewable because the record is inadequate for review.

Assuming, without deciding, that the defendant's motion for a new trial was timely filed,[9] we agree with the state regarding the substance of the motion and conclude that the record is inadequate to review this claim. The defendant argues that "it would be naive to believe that the jurors were unaware of what was going on with the COVID-19 pandemic." Notwithstanding that assertion, the defendant concedes that the "record is devoid of any evidence" indicating that jurors were unfocused, worried, or rushed during their deliberations. He contends that, in general, "[t]here is no telling how the jury was impacted by the news that was ever present during the early stages of 2020." This is precisely the problem with the defendant's argument; the defendant's contention that the jury felt rushed to reach a verdict in light of the COVID-19 pandemic is unsupported by the record. There is no indication, on the record, that the jury's deliberations were impacted, in any way, by the COVID-19 pandemic, generally, or Judge Carroll's March 12, 2020 suspension order, specifically. The jury had arrived at its verdict on March 12, 2020, at 12:10 p.m., and, in denying the defendant's motion for a new trial, the trial court explicitly noted that the defendant had presented no evidence regarding what time on that date the suspension order was issued, much less that the jury was aware of, or impacted by, that order. Moreover, after the jury returned its verdict, but before the jurors were discharged, the trial court explicitly asked the parties whether they would like the court to "address the jury further . . . ." At that point, if the defendant or his counsel believed that the jurors felt rushed to reach a verdict in light of the COVID-19 pandemic, it was incumbent on defense counsel to

timely alert the court regarding this concern. See *State* v. *Taylor G.*, 315 Conn. 734, 769, 110 A.3d 338 (2015) (explaining that preservation requirements "serve to alert the trial court to potential error while there is still time for the court to act" (internal quotation marks omitted)).

Without a record demonstrating that the jurors were aware of, and impacted by, the nascent stage of the global pandemic, there is no way of telling whether—or to what extent—their deliberations were impacted. As we have explained, as an appellate court, "[o]ur role is not to guess at possibilities, but to review claims based on a complete factual record developed by the trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claim] would be entirely speculative." (Internal quotation marks omitted.) *In re Azareon Y.*, 309 Conn. 626, 633, 72 A.3d 1074 (2013).

Accordingly, we conclude that the defendant's final claim of error is unreviewable, as he has not provided an adequate record for appellate review. See Practice Book § 61-10 (a) (it is appellant's burden to provide adequate record for review).

The judgment is affirmed.

In this opinion the other justices concurred.

[1] With respect to his constitutional claims, the defendant argues that the trial court violated his rights under both the state and federal constitutions. However, "[b]ecause the defendant has not provided an independent state constitutional analysis asserting the existence of greater protection under the state constitution, we analyze his [constitutional] claim[s] under the assumption that his constitutional rights are coextensive under the state and federal constitutions." *State* v. *Lewis*, 333 Conn. 543, 569 n.14, 217 A.3d 576 (2019).

[2] The defendant also pleaded no contest to a part B information charging him with being a persistent felony offender. This charge is not at issue in this appeal.

[3] At the outset, we note that the defendant was not entirely silent when speaking with Lorvita and the two male acquaintances. Rather, during both phone calls, the defendant voluntarily conversed with Lorvita and the men and, as we discussed, occasionally responded to their observations that he shot the victim. Specifically, as we described, the defendant typically gave brief, affirmative responses to any such observations or questions.

[4] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] We do not suggest that the police acted improperly and failed to provide the defendant his *Miranda* warnings when they were required to. Rather, the fatal flaw in the defendant's claim is that he raises an unpreserved claim pursuant to *Golding* and, therefore, bears the burden of providing this court with an adequate record for review. See *State* v. *Golding*, supra, 213 Conn. 240. Although the defendant provides several record cites in his brief that he claims establish he was given *Miranda* warnings prior to the phone calls, these record cites establish no such thing. Our careful review of the entire record does not reveal if or when the defendant received his *Miranda* warnings.

[6] The defendant also claims that the trial court erred in giving an instruction on adoptive admissions, insofar as the court informed the jury that it was permitted to use the defendant's silence against him, in violation of *Doyle*. After reviewing the entire record, including comments made by defense counsel in response to questions posed by the trial court during the charge conference, we conclude that the defendant waived this claim of error.

[7] In his brief, the defendant raised an additional claim of prosecutorial

impropriety, claiming that the prosecutor improperly had elicited opinion evidence regarding identification of the defendant from Lorvita, who was not an eyewitness to the crime, in violation of *State* v. *Finan*, 275 Conn. 60, 881 A.2d 187 (2005), overruled by *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022). At oral argument, the defendant abandoned this claim, in light of our recent decisions in *State* v. *Gore*, supra, 148–49, and *State* v. *Bruny*, 342 Conn. 169, 269 A.3d 38 (2022).

[8] "For an act of violence to be justified as self-defense, (1) the defendant must actually have believed that the victim was using or was about to use physical force against him, (2) a reasonable person, viewing all the circumstances from the defendant's point of view, would have shared that belief, (3) the defendant must actually have believed that the degree of force he used was necessary for defending himself or herself, and (4) a reasonable person, viewing all the circumstances from the defendant's point of view, also would have shared that belief." *State* v. *Mekoshvili*, 344 Conn. 673, 676 n.1, 280 A.3d 388 (2022).

[9] Practice Book §§ 42-53 and 42-54 provide that, within five days of the jury's verdict, a defendant may move for a new trial. In light of the COVID-19 pandemic, the Rules Committee of the Superior Court temporarily suspended this requirement. The amended provision, adopted on June 26, 2020, provides in relevant part: "[This] rule pertains to requiring the motion to be filed within five days after a verdict. By suspending the rule for those cases affected by the current situation, *the court would be allowed to extend the timing as it deems appropriate*." (Emphasis added.) Practice Book § E42-54. Although the note accompanying the rule stated that it would "take effect retroactively March 24, 2020," we are mindful that trial courts may have been inclined to review otherwise untimely motions in light of the evolving and uncertain circumstances surrounding the COVID-19 pandemic.

---